**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, ET AL., | § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. SA-17-CV-1242-XR |
| v. | § § | |
| JARVIS ANDERSON, ET AL., | § § | |
| *Defendants.* | § § | |

**ORDER**

On this date, the Court considered Defendants' Motion to Strike Allegations (docket no. 7) and Defendants' Motion to Dismiss (docket no. 8), and the responses and replies thereto.

**Background**

Plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), Bexar County Probation Officers Association ("BCPOA"), United Steelworkers Local Union 9528, and Sergio Castilleja filed this action against Defendants Jarvis Anderson, Brian Brady, and Bexar County Community Supervision and Corrections Department ("CSCD"), asserting primarily violations of their First Amendment rights to free speech and association in relation to union activity, as well as various state law claims.

Plaintiffs have submitted a lengthy 67-page Complaint covering events beginning in 2006. The Court summarizes the allegations, presuming them to be true at this stage. According to the Complaint, Plaintiff Castilleja formed, joined, and/or assisted in organizing the Union[1] at the CSCD for the mutual aid and protection of himself and his fellow probation officers and other employees of the CSCD, and he has been prominent in organizing CSCD employees into the Union and advocating on behalf of the Union and fellow employees. Compl. ¶ 8. Plaintiff Castilleja served as a Steward for the Union from 2007 until January 28, 2016, when he was elected president of Bexar County Probation Officers Association (BCPOA) by his fellow Union members. *Id.* ¶ 9.

On December 13, 2006, Castilleja along with other spokespersons for the labor organizing effort presented a petition and requested a meeting with the CSCD Director at the time, William Fitzgerald, to discuss grievances held in common by a substantial number of employees concerning working conditions. Because Fitzgerald did not meet with them and then announced that all employees who wished to continue working had to reapply for their jobs and attend retention interviews, fourteen CSCD employees, including Castilleja and Sheri Simonelli, sued Fitzgerald, alleging unlawful retaliation. Fitzgerald removed the lawsuit to this Court, where it was docketed as *Simonelli v. Fitzgerald*, SA-07-CA-360-XR.

Around the same time, the USW issued a charter to the CSCD employees as USW Local Union 9528, and the members adopted the name Bexar County Probation Officers Association (BCPOA). Simonelli was elected to serve as president. In 2008, she was terminated after sending an email from her private email address to her Union members and issuing a press release regarding a drug testing controversy at CSCD. She filed a lawsuit,

---

[1] USW and BCPOA are referred to collectively as "the Union."

docketed as 08-CV-648-XR, and it was consolidated with 07-CA-360-XR. Regarding their Complaint in this case, Plaintiffs state that their "purpose in referencing No. 07-CA-360-XR and 08-CV-00648-XR is not to rehash previous litigation, but rather to contribute to the historical context of the Bexar County CSCD, and Plaintiffs Castilleja's and Union's associational and speech activities in relation thereto, as ongoing matters of public concern." Compl. at 10 n.1.

Fitzgerald resigned in January 2010, and Defendant Jarvis Anderson was chosen by the Bexar County judges as the new CSCD Director. In May 2010, the consolidated actions were settled, and Simonelli has returned to her job as a probation officer.

Plaintiffs allege that Defendant Anderson removed language concerning protections for union membership from the CSCD Administrative Manual to prevent employees from knowing about their statutory rights. Plaintiffs allege that in the summer of 2011, CSCD created a "Non-Disclosure Agreement" and required employees to sign it. Counsel for BCPOA sent a letter objecting to the agreement as interfering with the right of employees to free speech to comment on matters of public concern. Anderson responded that CSCD honored and respected the First Amendment rights of employees and would not unlawfully infringe on them or coerce employees to give up those rights.

In December 2012, Simonelli was promoted to a first-line supervisory position. She remained a member and president of the BCPOA, but ceased representing individual employees in grievances and disciplinary appeals. As a result, Castilleja's responsibility to do so increased dramatically, and he represented employees in more grievances and appeals than any other BCPOA representative. Plaintiffs allege that Castilleja's frequent and vigorous

representation of fellow employees on behalf of the Union incurred the hostility of Defendant Anderson.

At their monthly membership meeting in February 2014, the members of BCPOA voted no-confidence in Defendant Anderson's leadership of CSCD. In July 2014, Plaintiff Union submitted a petition on behalf of the Union to the Bexar County Administrative Judges. Plaintiffs allege that "Anderson immediately engaged in vicious retaliation." Compl. ¶ 40. Plaintiffs allege that, within a few days after the Union delivered its petition, Anderson summoned BCPOA president Simonelli and interrogated her in a coercive manner over spurious alleged work performance and conduct issues, falsely accusing her of policy violations in a manner calculated to drive home a clear message of hostility toward her union activities and speech in her leadership of BCPOA. Anderson further threatened her with termination. Anderson also berated Vaughn so severely and viciously that it contributed to her hospitalization shortly thereafter, and subjected Castilleja to a coercive and threatening interrogation over false accusations. The Union's legal counsel sent another letter to Anderson addressing his alleged retaliatory actions, and Anderson's conduct ceased.

Plaintiffs allege that in December 2014, as part of a reorganization, Anderson forced Castilleja to become a DWI officer in Central 3 Region Office, in disregard of his seniority and his preference, and this was a display of Anderson's hostility toward Castilleja because of his vigorous Union activities.

In 2015, BCPOA invited Anderson to meet with the Union members to hear and discuss their concerns. Anderson refused to meet with them. After Anderson refused, the members of BCPOA, at their November 19, 2015 membership meeting conducted away from

CSCD premises and after work hours, again voted no-confidence in Anderson's leadership of the CSCD. The members of BCPOA endorsed a no-confidence petition with the intention of obtaining signatures and submitting the petition to the Bexar County district and county court judges who hear criminal cases to persuade the judges in their administrative capacities to remove Anderson from his position as CSCD Director. The petition listed 18 topics, several of which the Union felt were "of serious and legitimate public concern."

Plaintiffs allege that one of the serious concerns with Anderson's leadership articulated in the no-confidence petition was that probation officers with DWI caseloads were subjected to more rigorous performance scrutiny and audits of their cases than other officers. Other topics included in the petition asserted to be of public concern were: (1) "The Ever Changing Policies & Procedures of the Corrections Software Solutions"; (2) "The Frequent Transferring of Cases Based on Zip Codes & Defendants Lost in Transition"; (3) "The Unethical Activities & Behaviors of those in charge at the Residential Facilities"; (4) "Refusing to Meet with the Probation Officer's Association"; and (5) "The Large Disconnect between the Chief, the Judges, and the Employees." The "unethical activities" referenced concerns that Applewhite Road in-patient rehabilitation facilities were keeping probationers too long, past their judicially ordered terms of confinement. Complaint ¶¶ 58-59. The Complaint alleges that "[t]he CSCD adhering to judicial orders for the treatment of criminal defendants serving terms of probation supervised by the Defendant CSCD and Defendant Anderson is inherently a matter of public concern." *Id.* ¶ 59.[2] Plaintiffs allege that circulating the petition and its

---

[2] Plaintiffs also allege that Castilleja presented this particular matter to other agencies as well, including to the Texas Rangers in May 2016, noting "the misuse/abuse of State funds and the inhumane/civil rights violations of residents." *Id.* ¶ 153. Plaintiffs allege that he presented similar information to the FBI in September 2016 and to the Ombudsman Office of the TDCJ-CJAD. *Id.*

contents were not part of their ordinary job duties as CSCD employees. Plaintiffs further allege that Anderson knew of the vote to prepare the no-confidence petition.

In November 2015, Simonelli resigned as president of BCPOA, allegedly over stress that Anderson would retaliate against her. At that time, Castilleja was stationed at the Central 3 Region Office, and his supervisor John Escalante gave him a satisfactory performance review and "spoke glowingly about" his performance in November 2015. Castilleja was elected to fill the position of BCPOA president in January 2016. The next day, Anderson approached Castilleja in the CSCD workplace and tried to persuade Castilleja to put a stop to the no-confidence petition. Anderson asked Castilleja "to start on a fresh slate" regarding labor relations between Anderson and the Union. Castilleja responded that he would move forward with the petition, and Plaintiffs allege that this angered Anderson and he decided to retaliate by making an example of Castilleja. Anderson allegedly had telephone conversations with Simonelli in February and March 2016 in which he threatened to "get" Castilleja.

Plaintiffs allege that Anderson sought a pretext to terminate Castilleja's employment, both as an act of vengeance against Castilleja and for the purpose of deterring and coercing employees from supporting the Union's no-confidence petition by making an example of Castilleja. They allege that Defendant Brian Brady, Deputy Director of the CSCD, conspired with Anderson to frame up such a pretext, and they jointly decided to transfer Castilleja to another work unit in order to create such a pretext. Specifically, on February 11, 2016, two weeks after being elected president of BCPOA and declining Anderson's request to stop the no-confidence petition, Castilleja was abruptly transferred to the Northwest 5 Region office, under the supervision of Joel Merino. Transferring an employee to another unit may trigger an

audit of the employee's case work in the employee's old unit under CSCD procedures, and Plaintiffs contend that this was the reason Anderson transferred him. Castilleja had previously requested such a transfer, but had been denied.

Brady allegedly approached Castilleja's prior supervisor Escalante and directed him to help gather case files that Castilleja had worked on while under Escalante's supervision, in order to find examples of poor performance. Anderson and Brady further pursued their plan by auditing the cases Castilleja handled under supervisor Merino after Castilleja's transfer to the Northwest 5 Region office. Anderson and Brady began the audit of Castilleja's case work under supervisor Merino about April 2016, without informing Merino. Merino and the assistant supervisor were never asked about Castilleja's work performance during the review "because [Anderson and Brady] were carrying out a deliberate plan to terminate Plaintiff Castilleja's employment in an act of retaliation and did not care to know any facts that might be presented to them by the supervisor and assistant supervisor who worked with and supervised Plaintiff Castilleja day in and day out." Compl. ¶ 85.

On August 5, 2016, Anderson presented Castilleja with a "notice of proposed adverse action" to discharge him from the CSCD. On that date, Anderson caused Castilleja to be removed from the CSCD workplace premises and placed on administrative suspension without pay. Anderson alleged that Castilleja had committed negligence and/or violated department policies in his handling of 15 probationer cases over a nearly two-year time span in which he supervised numerous probationers. Plaintiffs assert this was inconsistent with Castilleja's performance reviews. They allege that when supervisor Merino informed Brady of his disagreement with taking adverse action against Castilleja over his work performance, Brady

told Merino that the adverse action was not based on Castilleja's case handling, but on his conducting Union business on work time. But at a Texas Workforce Commission hearing on May 3, 2017, Brady testified under oath as a spokesman for the CSCD that the alleged case handling infractions were the sole reason for the discharge. Plaintiffs allege that any of the alleged errors identified are "routine and common among probation officers due to the heavy workload carried by Bexar County CSCD probation officers caused by inadequate staffing, inadequate funding, and Defendant Anderson's poor leadership." Compl. ¶ 102. Plaintiffs make additional allegations to show that the adverse action was based on pretext.

On November 9, 2016, Castilleja submitted the no-confidence petition to the Bexar County judges with an explanatory cover letter. The petition included approximately 100 signatures of a combination of CSCD employees and non-employees. Castilleja also gave a copy to Anderson. The judges took the petition under consideration, and while they were considering the petition, a counter-petition signed by CSCD employees expressing support for Anderson was submitted.

In response to the August 6, 2016 notice of adverse action, Castilleja had requested a procedure that is termed an "appeal hearing" in the CSCD Administrative Manual. The hearing was conducted as a meeting with Anderson on November 15, 2016. Castilleja's supervisor Merino participated and informed Anderson of his disagreement with the proposal to discharge Castilleja. After the meeting, Anderson advised Castilleja that he would take the information provided under consideration and would inform Castilleja of his decision later. Plaintiffs allege that Anderson wanted more time to frame additional unfavorable allegations against Castilleja to attempt to induce Castilleja to resign or retire, so that Anderson could

avoid a judicial challenge. In December 2016, Anderson communicated to Castilleja's counsel in writing that he had conducted an audit and "quantitative analysis" of 94 cases handled by Castilleja and that Castilleja had allegedly committed policy infractions in a majority of them. Anderson stated he would allow Castilleja to resign or retire in lieu of being discharged.

In late December 2016, the Bexar County judges voted to retain Anderson as director. On January 3, 2017, Anderson notified Castilleja that his "final decision" was to terminate Castilleja's employment. Anderson stated that the adverse action was based only on the originally identified cases, and thus he would not grant Plaintiff Castilleja an opportunity to respond to the December 2016 "quantitative analysis" allegations. Plaintiffs complain that Castilleja has never been afforded an opportunity to clear his name with respect to these allegations.

Plaintiffs USW and BCPOA allege that they suffered injury from the Defendants' actionable conduct, through loss of support and membership among CSCD employees due to the chilling effects of the Defendants' retaliatory discharge of the BCPOA president, Castilleja. They allege that, as a result of the retaliatory discharge and the chilling effects it created, membership in the BCPOA and USW declined by approximately 30% or more, resulting in lost membership dues. They further allege that the chilling effect created by Anderson's retaliatory discharge made Union members uneasy about asking other employees to join the Union and uncomfortable about soliciting further signatures on the no-confidence petition and made employees, including Union members, afraid to sign the petition.

Plaintiffs further allege that Anderson moved Castilleja's former supervisor Merino to an inconvenient work location and threatened his wife with adverse employment action, and

that Anderson has attempted to coerce Merino from testifying on behalf of Castilleja and to coercively deter other employees from testifying.

Plaintiffs allege their causes of action in eighteen paragraphs. In Paragraphs 157 to 160, Castilleja sues Anderson (¶¶ 157-158), Brady (¶ 160), and the CSCD (¶ 159) under § 1983 for retaliatory discharge in violation of the First and Fourteenth Amendments, seeking compensatory and injunctive relief. Castilleja sues Anderson in his individual and official capacities, and Brady in his individual capacity. In Paragraph 161, Castilleja sues Anderson and Brady individually for conspiracy under § 1985.

In Paragraph 162, Castilleja alleges that Anderson (in his individual and official capacities) deprived him of a liberty interest without due process in violation of the Fourteenth Amendment by refusing to permit him to be heard in response to the allegations of improper case handling based on the alleged audit presented in December 2016.

In Paragraphs 163 through 166, Castilleja sues Anderson and Brady in their individual and official capacities for injunctive relief for violations of Article I, § 8 and Article I, § 27 of the Texas Constitution. In Paragraphs 167 through 169, Castilleja sues Anderson and Brady in their individual capacities for compensatory damages for violations of § 101.301 of the Texas Labor Code.

In Paragraphs 170 to 173, the Union asserts claims against Anderson in his individual and official capacities for violations of the right to freedom of association and for violations of due process and equal protection (under § 1983), violations of the Texas Government Code § 617.004, Texas Labor Code §§ 101.001 and 101. 301, and Article I, § 3 of the Texas Constitution and for violations of their members' right to association.

And in Paragraph 174, all Plaintiffs sue for a violation of the Fourteenth Amendment, seeking injunctive relief against Anderson (capacity not specified) for attempting to coerce a material witness from testifying on behalf of Plaintiffs in this action.

Defendants have filed a motion to strike allegations in the Complaint relating to the prior litigation, and have also filed a motion to dismiss most of Plaintiffs' claims on various grounds.

**Analysis**

Defendants move to dismiss most of Castilleja's claims and all the Union's claims. Plaintiffs have conceded some claims and have responded to some, but not all, of the remaining arguments in the motion to dismiss. The Court conducted a status conference and hearing on the pending motions on May 30, at which time Plaintiffs were asked to clarify whether they intended to abandon the claims on which they had failed to respond. Plaintiffs conceded the § 1985 conspiracy claim and the substantive due process name clearing claim, but expressed a desire to pursue all remaining claims.

1. <u>Limitations and Motion to Strike Paragraphs 7 through 29</u>

Defendants assert that no claims may be asserted for actions occurring before December 7, 2015 because they are barred by limitations. Defendants further assert that the allegations contained in ¶¶ 7 to 29 should be stricken because they involve prior litigation that has been settled, and Plaintiffs are using these allegations to improperly expand the scope of this case, including discovery. Plaintiffs state that these allegations are included merely for historical context and that they "do not seek judicial relief in this action for events that predate the two-year point prior to filing this suit." Docket no. 19 at 14. Plaintiffs state that they have

pled prior events for the purpose of corroborating Anderson's motive of animus toward Castilleja's and other employees' Union activities, demonstrating the background and history of significant public concern in the subjects of labor relations at the Bexar County CSCD and the governance and management of the CSCD, evidencing the pretextual nature of Castilleja's discharge, and demonstrating Anderson's clear awareness of the Plaintiffs' clearly established First Amendment rights. Given Plaintiffs' concession on limitations and the understanding that discovery will be limited to a reasonable time period, the motion to strike is denied.

2. Eleventh Amendment Immunity and Claims Seeking Injunctive Relief

Defendant CSCD asserts Eleventh Amendment immunity to suit for all claims, federal and state, except for those permitted under the doctrine of *Ex Parte Young*. Docket no. 8 at 5 & n.13. Defendants assert that all claims against the CSCD are barred by Eleventh Amendment immunity because a county adult probation department is an arm of the state. *See, e.g.*, *Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 745 (5th Cir. 1986) ("While no single factor conclusively shows that Adult Probation is an arm of the state, viewing all the factors as a whole, we hold that [Tarrant County] Adult Probation is an arm of the state within the meaning of the Eleventh Amendment, and that the federal courts lack subject matter jurisdiction over appellants' section 1983 claims against it.").[3] Plaintiffs respond that, "[u]pon good faith consideration of Defendants' motion, Plaintiffs agree that the CSCD is an arm of the State of Texas, which therefore cannot be sued in this action, even for prospective equitable relief" and "Plaintiffs consent to the dismissal of the CSCD." Docket no. 19 at 17. The only claim brought directly against the CSCD is in ¶ 159, which seeks injunctive relief

---

[3] Defendants cite a number of cases in their motion at fn. 16 to support the assertion that a county probation department is an arm of the State. *See also Yowman v. Jefferson Cty. Community Supervision & Corrections Dep't*, 370 F. Supp. 2d 568, 588 (E.D. Tex. 2005).

against CSCD for violation of federal constitutional rights. Accordingly, this claim against CSCD is dismissed.

Plaintiffs also bring a number of claims against CSCD in the form of official-capacity claims against Anderson and Brady. It is well established under both federal and Texas law that claims against an official in his official capacity are the same as claims against the government entity itself. *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) ("It is fundamental that a suit against a state official is merely 'another way of pleading an action against the entity of which [the official] is an agent.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Defendants assert Eleventh Amendment immunity from Plaintiffs' official-capacity federal claims seeking retroactive injunctive relief, recognizing that Plaintiffs may be able to pursue prospective injunctive relief under the doctrine of *Ex Parte Young*. They assert that "retroactive injunctive relief" in the form of restored benefits is not recoverable in an official-capacity claim against Anderson because that claim is barred by Eleventh Amendment immunity.[4] Defendants also assert Eleventh Amendment immunity with regard to Plaintiff's claims under the Texas Government Code, Texas Labor Code, and Texas Constitution, which are asserted against CSCD via official-capacity claims against Anderson and Brady. Docket no. 8 at 5 & n.13. Defendants contend that "[t]his jurisdictional bar applies regardless of the nature of the relief sought." *Id.* at 5 & n.15.

---

[4] In a footnote, Defendants also note that, to the extent the Union is seeking compensatory damages in the form of lost union dues from Anderson in his official capacity (Compl. ¶ 170), such a claim is barred by the Eleventh Amendment. Docket no. 8 at 7 n.25. Plaintiffs state in their Response brief that they concede that compensatory damages are not available for the Union's associational standing claims in ¶ 170 and that they withdraw any claims for money damages for individual Union members based on ¶ 121. Docket no. 19 at 16. Otherwise, the claim for lost dues is asserted only against Anderson and Brady in their individual capacities.

Defendants also assert that Plaintiffs cannot request injunctive relief from Anderson in his personal capacity because, as a private individual, he is unable to reinstate Castilleja, provide benefits, or restrain future chiefs. Plaintiffs respond that they agree "they should not seek injunctive relief against Anderson and Brady in their individual capacities." Docket no. 19 at 17.

Plaintiffs respond that they agree "they should not seek injunctive relief against Anderson and Brady in their individual capacities," but "point out that such relief is sought against Anderson in his official capacity." Docket no. 19 at 17. Thus, any claim seeking injunctive relief against Anderson and Brady individually (including in ¶¶ 158, 163, 164, 165, 166, 170, 171, 172, 173, & 174) is dismissed. Because it does not appear that Plaintiffs are voluntarily dismissing any of their official-capacity claims for injunctive relief, the Court will consider Defendant's assertion of Eleventh Amendment immunity for these claims, which include claims against Anderson and Brady in their official capacities under both federal and state law.

The Eleventh Amendment generally provides immunity to a State against suits in federal court by a citizen of the State against the State or a state agency or department. *Saahir v. Estelle*, 47 F.3d 758, 760 (5th Cir. 1995). A suit in which relief is sought nominally against a state official is in fact against the sovereign if the decree would operate against the latter such that the state is the real, substantial party in interest, regardless of whether the suit seeks damages or injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984) (noting that suit against state officials is against the sovereign if the decree would operate against the latter and the jurisdictional bar applies regardless of the nature of the relief sought); *Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.").

In *Ex Parte Young*, the Supreme Court recognized an exception to Eleventh Amendment immunity to vindicate federal rights, by allowing claims for prospective injunctive relief against state actors in their official capacities.[5] For *Ex Parte Young* to apply, the plaintiff must (1) allege a violation of federal law; (2) bring a claim against individual persons in their official capacities as agents of the State, and (3) seek declaratory or injunctive relief in nature and prospective in effect. *Fontenot v. McCraw*, 777 F.3d 741, 752 (5th Cir. 2015); *Simmang v. Tex. Bd. of Law Examiners*, 346 F. Supp. 2d 874, 886 (W.D. Tex. 2004). Under *Ex Parte Young*, a federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984). For *Ex Parte Young* purposes, retroactive relief is that which compensates a plaintiff, through monetary damages or restitution, for the defendant state official's past breach of a legal duty or past violation of federal law. *Simmang*, 346 F. Supp. 2d at 887.

With regard to their federal claims, Castilleja and the Union both assert claims against Anderson in his official capacity seeking injunctive relief. *See* Compl. ¶ 158 (First Amendment), ¶ 170 (First Amendment), ¶ 172 (Fourteenth Amendment); ¶ 174 (Fourteenth Amendment). In Paragraph 158, Castilleja seeks reinstatement to his position, "together with all rights, privileges, pay, emoluments and benefits of employment enjoyed by him prior to his unconstitutional and unlawful discharge," to include "restoration of service credit and all benefits such as but not limited to retirement credit, accrued annual leave and sick leave, retroactive to August 5, 2016, as if he had never been suspended or subsequently discharged,

---

[5] Defendants also contend that the state and state officials are not "persons" subject to liability under § 1983. But "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989).

and at the pay rate he would have achieved by the date [of] reinstatement as if he had never been suspended or discharged." Compl. ¶ 158.

The Fifth Circuit has held that official-capacity claims under *Ex Parte Young* are an "appropriate vehicle for pursing reinstatement to a previous job position." *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008); *see also Meeks v. Tex. Dep't of Aging & Disability Servs.*, No. 1:16-cv-1135-RP, 2017 WL 8182825 (W.D. Tex. July 19, 2017). Thus, reinstatement and an injunction against future violations of Castilleja's rights are within *Ex Parte Young*.

However, the Eleventh Amendment precludes a plaintiff from recovering back pay, front pay, or retroactive monetary relief as compensation for past violations, regardless of whether such relief is characterized as equitable. *Jones v. Tex. Juvenile Justice Dept.*, 646 F. App'x 374, 376-77 (5th Cir. 2016). Defendants argue that the accompanying request for "repayment of service credits; payment of retirement credits, addition to leave balances; and 'all other emoluments and benefits'" is retroactive. Docket no. 8 at 7. To be more precise, Castilleja seeks not "repayment" but "restoration of service credit and all benefits such as but not limited to retirement credit, accrued annual leave and sick leave, retroactive to August 5, 2016." Retroactive relief as compensation is barred, but payment of state funds as a necessary consequence of compliance in the future with a substantive federal-question determination is permissible. *Fontenot v. McCraw*, 777 F.3d 741, 754 (5th Cir. 2015). It is not entirely clear whether Castilleja is seeking impermissible retroactive relief. If Castilleja is merely asserting that he is entitled to future pay at a certain level and with certain service credits going forward, it may be prospective, with any monetary effects being incidental to the prospective relief.

Monetary relief that is "ancillary" to injunctive relief is not barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 n.19 (1985). However, neither party has briefed this issue, and thus the Court does not decide it at this time. It is enough to survive the motion to dismiss that Plaintiff requests reinstatement, which is within *Ex Parte Young*. The exact contours of that reinstatement can be addressed at a later time.

For its federal claim based on the First Amendment, the Union seeks "appropriate injunctive relief to permanently restrain and enjoin Defendant Anderson and all persons working in privity or concert with him, and his successors, from interference, restraint, or coercion in the exercise of their rights to associate with the Plaintiffs USW and BCPOA." Compl. ¶ 170. For its federal claim based on the Equal Protection and Due Process Clauses, the Union seeks injunctive relief to restrain Anderson and others from interfering with, restraining, or coercing employees in their exercise of the right to join or support the unions and from discriminating in favor of other employee organizations and against the unions in the use of application of departmental facilities, time, means, of communication, supplies, equipment, disciplinary actions, policies, and other tangible and intangible resources and actions. Defendants do not assert that the requested injunctive relief for these claims is unavailable under *Ex Parte Young*. And Plaintiffs' witness coercion claim (¶ 174) seeks only "appropriate restraint and injunction" and would thus be limited to prospective relief. Thus, these official-capacity federal claims are not barred by the Eleventh Amendment.

As noted, the *Ex Parte Young* exception requires an alleged violation of federal law. Plaintiffs Castilleja and the Union also assert claims under various Texas statutes and under the Texas Constitution against Anderson and Brady in their official capacities, seeking

injackive relief. Compl. ¶¶ 163, 164, 165, 166, 171, 173.[6] These claims seek to enjoin these Defendants, in their official capacities, from engaging in certain conduct, based on state law. Defendants argue that such claims are barred by Eleventh Amendment immunity "regardless of the nature of the relief sought." Docket no. 8 at 7 & n.15 (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984)).

In *Pennhurst*, the Supreme Court held that federal courts do not have jurisdiction to order state officials to conform their conduct to *state* law. *Saahir v. Estelle*, 47 F.3d 758, 761 (5th Cir. 1995) (citing *Pennhurst*, 465 U.S. at 124-25); *see also Hughes v. Savell*, 902 F.2d 376, 378 n.2 (5th Cir. 1990) ("The exception to the Eleventh Amendment created by the Supreme Court in *Ex Parte Young*, which permits suits for prospective relief against state officials, applies only to violations of *federal or Constitutional law* by those officials."). The Supreme Court held that the basis for the doctrine of *Ex Parte Young* – the need to reconcile state immunity with federal law supremacy – is wholly absent when a plaintiff alleges that a state official has violated state law. "A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law" and instead is a great intrusion on state sovereignty. *Pennhurst*, 465 U.S. at 124-25. Because such a result "conflicts directly with the principles of federalism that underlie the Eleventh Amendment, . . . *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." *Id.* Following *Pennhurst*, the Fifth Circuit has held that "the only legitimate basis for federal court intervention consistent with the Eleventh Amendment [is] the vindication of federal rights." *Saahir*, 47 F.3d at 761 (citing *Lelsz v. Kavanagh*, 807 F.2d 1243 (5th Cir. 1987)).

---

[6] As noted, Plaintiffs agreed to voluntarily dismiss their official-capacity claim seeking damages.

In *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 253-53 (1985), the Supreme Court further explained that the Eleventh Amendment forecloses the application of normal principles of ancillary and pendent jurisdiction where claims are pressed against the State: "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Id.* (quoting *Pennhurst*, 465 U.S. at 121). Unless the State has waived its constitutional immunity to suit in federal court on a state-law claim, the federal courts cannot exercise ancillary jurisdiction over the claim. There is no indication that Texas has waived its Eleventh Amendment immunity to suits in federal court for the claims brought by Plaintiffs under Texas law and the Texas Constitution.[7]

Thus, in *Holloway v. Walker*, 765 F.2d 217 (5th Cir. 1985), the Fifth Circuit cited *Pennhurst* and held that state officials "are immune from suit in federal court for equitable relief based on state law because the eleventh amendment denies federal courts the jurisdiction to issue such injunctions against state officials." *Id.* at 525. The Court further concluded that

_____

[7] Although the Texas Constitution's Bill of Rights does not provide a private right of action for damages for violations of constitutional rights, including speech and assembly rights, suits for equitable remedies are not prohibited, and may in some instances be directed at the government entity itself. *City of Elsa v. M.A.L.*, 226 S.W.3d 390 (Tex. 2007); *City of Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995). However, suits complaining of *ultra vires* acts of officials may not be brought against a governmental unit; they must be brought against the allegedly responsible government actor in his official capacity. *Patel v. Tex. Dep't of Licensing & Reg.*, 469 S.W.3d 69, 76 (Tex. 2015). The premise underlying the *ultra vires* exception is that the State is not responsible for unlawful acts of officials, and thus the claim must allege that the state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion. *Id.* However, the Texas Supreme Court has recognized that although *ultra vires* "suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity, . . . the suit is, for all practical purposes, against the state." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). In any event, Plaintiffs have not alleged *ultra vires* action; they allege only that Anderson violated state law. The Fifth Circuit has held that "a claim that state officials violated *state* law in carrying out their official responsibilities is a claim against the State." *Hughes v. Savell*, 902 F.2d 376, 378 (5th Cir. 1990). Thus, these claims implicate Eleventh Amendment immunity. Even if Plaintiffs were asserting *ultra vires* official-capacity claims as permitted by Texas law, the fact that a State permits certain claims in its own courts does not establish a waiver of immunity to suit in federal court.

the limited exception to Eleventh Amendment immunity for *ultra vires* claims did not apply and the official was "immune from suit for equitable relief based on state law" because "a state officer may be said to act *ultra vires* only when he acts 'without any authority whatever.'" *Id.*; *see also Beleno v. Lakey*, No. 09-CV-188-FB, 2009 WL 10699345 (W.D. Tex. Sept. 17, 2009).

Plaintiffs' state-law claims against Anderson and Brady in their official capacities are barred by the Eleventh Amendment, regardless of the relief sought. *Pennhurst*, 465 U.S. at 106.[8] Thus, because Plaintiffs have voluntarily dismissed their claims seeking injunctive relief against Anderson and Brady in their individual capacities and because the Eleventh Amendment bars their state-law claims against Anderson and Brady in their official capacities, Plaintiffs' state-law claims asserted in Paragraphs 163, 164, 165, 166, 171, and 173 are dismissed.

---

[8] *See also McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) ("However, since state law claims do not implicate federal rights or federal supremacy concerns, the *Young* exception does not apply to state law claims brought against the state. Eleventh Amendment immunity extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself. Appellees brought suit against Abbott in his official capacity. Therefore, the Eleventh Amendment bars suit here, where Abbott is sued in his official capacity as Attorney General of the State of Texas for violations of the Texas Constitution. Appellees' state law claims are dismissed."); *Earles v. State Bd. of Certified Public Accountants*, 139 F.3d 1033, 1039-40 (5th Cir. 1998) ("The rule of *Ex parte Young* empowers the federal courts to grant the prospective injunctive relief sought by the plaintiffs if the rules challenged in this case do indeed violate federal law. The plaintiffs' state-law claims, however, are not cognizable in a proceeding under *Ex parte Young* because state officials continue to be immunized from suit in federal court on alleged violations of state law brought under the federal courts' supplemental jurisdiction. . . . Thus, the plaintiffs' suit may proceed against the individual members of the Board under the doctrine of *Ex parte Young*, but the limitations of the doctrine require that the plaintiffs' state-law claims be dismissed upon remand."); *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 125 (5th Cir. 1992) ("We also find no error in the remand of the state-law claims against defendants in their official capacities. In *Pennhurst*, the Supreme Court held that the Eleventh Amendment bars pendent state-law claims from being brought in federal court against the state. The district court thus lacked jurisdiction to hear the state-law claims against defendants in their official capacity."); *Simmang*, 346 F. Supp. 2d at 889-90 ("[R]egardless of the fact that Plaintiff seeks no monetary damages, the Eleventh Amendment bars his state law claim against *all* Defendants.").

### 3. First Amendment Retaliation Claims

In Paragraphs 157 to 160, Plaintiffs assert a claim that Castilleja's discharge was unconstitutional retaliation for "his protected exercises of freedom of speech and freedom of association" in violation of the First and Fourteenth Amendments. Given Plaintiffs' concessions discussed in section 2 above, this claim is now asserted against Anderson and Brady in their individual capacities for compensatory damages, and against Anderson in his official capacity for prospective injunctive relief (reinstatement).

Defendants contend that Castilleja's First Amendment free speech retaliation claims fail because his speech was not on a matter of public concern.[9] It is undisputed that the threshold requirement for public employee speech to be entitled to First Amendment protection is that the employee must be speaking as a citizen on matters of public concern. *Lane v. Franks*, 134 S. Ct. 2369 (2014). As *Lane* makes clear, this involves two separate requirements: the employee must be speaking as a private citizen rather than an employee, and his speech must be on a matter of public concern. The Fifth Circuit has held that, post *Lane*, the citizen versus employee analysis is determined by whether the employee was acting within the scope of his ordinary job responsibilities or duties, even if the speech related to his public employment or concerned information learned during that employment. *Gibson v. Kilpatrick*, 838 F.3d 476, 482 (5th Cir. 2016). Whether speech involves a matter of public concern is

---

[9] In a footnote, Defendants contend that their arguments apply with equal force to the claims brought under the Texas Constitution, citing *Johnson v. Houston Indep. Sch. Dist.*, 930 F. Supp. 276, 288 (S.D. Tex. 1996). The claims under Article I, § 8 & § 27 of the Texas Constitution are asserted against Anderson and Brady in their individual and official capacities and seek injunctive relief. Complaint §§163-166. As discussed above, the official-capacity claims are barred by the Eleventh Amendment, and the individual-capacity claims were voluntarily dismissed.

determined by the content, form, and context of the speech, as revealed by the whole record. *Id.* (quoting *Connick*, 461 U.S. at 147-48). [10]

If these threshold requirements are not met, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *Id.* at 2378 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If the plaintiff has spoken as a citizen on a matter of public concern, then the possibility of a First Amendment claim arises, with the question being whether the government entity had an adequate justification based on the government's needs as an employer. *Lane*, 134 S. Ct. at 2378, 2380.

Defendants assert that Plaintiffs cannot meet the threshold requirement because the petition pertains to labor relations at CSCD, not matters of public concern. Defendants contend that Anderson's refusal to meet with the Union, changes to the software policies and procedures, frequent transferring of cases, and perceived unethical behavior by residential facility operators relate to a private labor dispute or are interesting to the public purely by virtue of the department's status as an arm of government. Defendants assert that, to the extent any assertion of "unethical behavior" did qualify as a matter of public concern, it was a job responsibility to report internal misconduct under the TDCJ-CJAD Code of Ethics, making any such reporting part of Castilleja's official duties. Docket no. 8 at 9. [11]

---

[10] Before *Lane*, the Fifth Circuit had reached the same conclusion under both tests, in part because the Court had "emphasized that one does not speak as a citizen if his speech occurs as part of a 'personal employment dispute.'" *Gibson*, 838 F.3d at 482 n.4. In *Gibson*, the Court found that the employee was acting as a citizen but was not speaking on a matter of public concern, and noted that this divergence was due to the change in focus to ordinary job duties as the key to the citizen-employee analysis. *Id.*

[11] Defendants contend that the Court should reach the same result that it did in *Simonelli v. Fitzgerald* on this issue. In *Simonelli*, the Court concluded that the employees' union petition to the CSCD Director complaining about the terms and conditions of employment were made in the capacity of employees rather than citizens and was not protected by the First Amendment because the speech and activity "were related to their official duties and done during the course of performing their job." 2008 WL 744708, at *3 (W.D. Tex. Mar. 19, 2008); 2009 WL 3806489, at *6 (W.D. Tex. Oct. 22, 2009). *Simonelli* involved different facts and was decided before *Lane*.

Plaintiffs respond that the Complaint alleges that Anderson retaliated against Castilleja for his union *associational* activity, which, unlike speech, does not require independent proof of public concern. The law in the Fifth Circuit has been settled for decades that "no independent proof of public concern is required in a freedom of association claim arising from union organizing activity." *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993) (holding that this law was clearly established in 1987).[12] Specifically, Plaintiffs allege that Anderson, assisted by Brady, retaliated against Castilleja because Castilleja refused to use his position as the new Union president to stop the Union no-confidence petition such that "Castilleja suffered adverse action as a result of his Union associational activity." Thus, Plaintiffs contend that this case is primarily about freedom of association, not speech, and thus there is no public concern threshold requirement.

To the extent speech is involved and there may be a public concern requirement, Plaintiffs respond that Castilleja was acting as a citizen insofar as pursuit of the Union petition was not an ordinary duty of his employment as a probation officer, and that Defendants ignore settled precedent that speech in the context of union activity will seldom be deemed merely personal. Plaintiffs further argue that the Union petition that Castilleja refused to withdraw at Anderson's request clearly raised some matters of public concern.

To establish a free speech retaliation claim, a public employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on matters of public concern; (3) his interest in commenting on matters of public concern outweighed the defendant's

---

[12] The Circuits appear to be split on whether an employee must demonstrate that the protected activity relates to a matter of public concern to trigger protection from retaliation for First Amendment association rights, with the Fifth Circuit and Eleventh Circuits in the minority. *Rossiter v. City of Philadelphia*, 674 F. App'x 192, 197-98 (3d Cir. 2016) (listing the circuits in the split, with the Second, Seventh, Fourth, Sixth, and Tenth Circuit applying a public concern requirement, and the Fifth and Eleventh Circuits not).

interest in promoting workplace efficiency; and (4) his speech was a substantial or motivating factor in the defendant's adverse employment action. *See Lane v. Franks*, 134 S. Ct. 2369 (2014). A First Amendment association retaliation claim requires a plaintiff to show: (1) that he suffered an adverse employment action; (2) that his interest in associating outweighed Defendants' interest in efficiency; and (3) that his association with the union was a substantial or motivating factor in the adverse employment action. *Lawson v. City of Monroe*, 579 F. App'x 305, 310 (5th Cir. 2014) (citing *Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002)). In *Boddie*, the Fifth Circuit noted that many cases would defy simplistic categorization as speech or association, "with entangled speech and associational freedoms at issue," but noted that "even this difficulty is eased by the countervailing reality that speech in the context of union activity will seldom be personal; most often it will be political speech." *Boddie*, 989 F.2d at 750. The Court noted that it could "escape this difficulty" because *Boddie* involved "no more than associational activity." *Id.* It did not expressly discuss how the analysis might change if there were entangled union speech and associational freedoms at issue.

Plaintiff Castilleja brings a First Amendment retaliation claim premised on *both* his free speech rights and his associational rights related to his union activity, though he emphasizes the associational activity. In their Reply, Defendants recognize that associational retaliation claims do not require public concern, but assert that "[w]hen a plaintiff's First Amendment retaliation claim is based on his associational activity *and* speech, the public-concern inquiry remains part of the court's consideration," citing *Gentry v. Lowndes Cty., Miss.* 337 F.3d 481, 488-89 (5th Cir. 2003) and *Vojvodich v. Lopez*, 48 F.3d 879, 884-85 (5th Cir. 1995). Defendants do not further elaborate on this assertion. Having reviewed these cases

and the landscape of First Amendment retaliation law in the Fifth Circuit, the Court finds that the standard to be applied to cases involving mixed speech and association outside the context of political patronage and political speech/activity cases is unclear. However, at the hearing, Defendants conceded that the applicable test is a balancing test, and that public concern is not a threshold requirement.

As noted, the *Boddie* Court held that public concern was not a threshold requirement in a union association case. Although it recognized that it was an association-only case, it stated that it had dealt with a case involving both speech and association in *McBee v. Jim Hogg County*, 730 F.2d 1009 (5th Cir. 1984), and settled on the *Pickering* balancing test for the political patronage claim, noting "[w]e did not insist on a threshold finding of public concern." Thus, *Boddie* indicates that cases involving both speech and association do *not* require a threshold finding of public concern, but that courts would instead apply the *McBee-Pickering-Connick* balancing test.

*McBee* and subsequent cases following it -- *Kinsey v. Salado Independent School District*, 950 F.2d 988 (5th Cir. 1992); *Gentry v. Lowndes County*, 373 F.3d 481 (5th Cir. 1992); and *Vojvodich v. Lopez*, 48 F.3d 879 (5th Cir. 1995) -- establish a Fifth Circuit approach to cases involving political activity, placing "cases involving only political association, only speech, or a combination of the two on a spectrum." *Gentry*, 337 F.3d at 485. Cases involving retaliation for simple political affiliation fall on the employee's side, where little, if any, weighing is called for, while cases involving employee activities that "clearly over-balance" the employee's usefulness fall at the employer's end of the spectrum. *Gentry*, 337 F.3d at 485-86; *Kinsey*, 950 F.2d at 993-94. When cases fall mid-spectrum, courts in this

circuit must apply a "*Pickering* balancing, as refined by *Connick*." *Kinsey*, 950 F.2d at 994. In this analysis, courts balance the extent to which public concerns are implicated by the employees' speech or association against the significance of maintaining a close or confidential working relationship with the public employer. *Gentry*, 337 F.3d at 486; *Kinsey*, 950 F.2d at 994.[13] Thus, the "*McBee-Pickering-Connick* 'balancing test is not all-or-nothing but rather a sliding scale under which 'public concern' is weighted against disruption: 'a strong showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern.'" *Click v. Copeland*, 970 F.2d 106 (5th Cir. 1992).

However, although it is referenced in *Boddie*, this particular balancing analysis appears to have been applied solely to political activity/patronage cases.[14] The Fifth Circuit has described political patronage cases as "a special subset of the Supreme Court cases regulating a public employee's discharge for speech on matters of public concern." *Desormeaux v. Sheriff's Office Cameron Parish*, 46 F. App'x 731 (5th Cir. 2002).

---

[13] This closeness is not determined as much by the number of persons involved, but whether it is a function of the particular public responsibility being carried out. *Kinsey*, 950 F.2d at 994. If it is essential for such relationships to be close, the court must then determine whether the particular speech and other conduct sufficiently disrupted the working relationship as to prevent effective performance, requiring a stronger showing of disruption as the employee's speech moves closer to core public concerns. *Id*. In assessing such disruptive effect, the court should consider the time place, and manner of the political activity, and whether, taken in context, the particular activity should be considered sufficiently hostile, abusive, or insubordinate, as to disrupt significantly the continued operation of the office. *Id*.

[14] *Boddie* did not state that it would apply the *McBee* test to all mixed union speech and association cases. It cited *McBee* to support its conclusion that association cases, unlike speech cases, did not require a threshold finding of public concern. However, it follows from *Boddie*, which emphasized that the Court did not require a threshold showing of public concern for the mixed speech and association claims in *McBee*, that mixed speech and association cases in general do not require a threshold finding of public concern. However, all the cases that the Court has located that do apply the *McBee* test have involved political patronage and political activity, which inherently involve public concern aspects. *See, e.g.*, *Jordan v. Ector Cty.*, 516 F.3d 290 (5th Cir. 2008); *Desormeaux v. Sheriff's Office Cameron Parish*, 46 F. App'x 731 (5th Cir. 2002); *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999); *Brady v. Fort Bend Cty.*, 145 F.3d 691 (5th Cir. 1998); *Click v. Copeland*, 970 F.2d 106, 112-13 (5th Cir. 1992); *Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988). Nevertheless, some of the cases upon which *McBee* relied in fashioning its balancing test were not political patronage or political activity cases. Thus, the Court will apply the *McBee* balancing test in this case.

In *Gentry*, the Court stated that it had "adapted the [*Pickering/Connick* balancing analysis applicable to speech claims] to hybrid situations involving *political* association as well as speech claims." *Gentry*, 337 F.3d at 486 n.7 (emphasis added). The special rules for political activity generally flow from the recognition that sometimes the nature of the plaintiff's job makes political affiliation or loyalty a valid job qualification, either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts. *Fuerst v. Clark*, 454 F.3d 770 (7th Cir. 2006). These concerns do not appear present here; Anderson is not an elected official and Castilleja's and the Union's activity in this case was not political.

The *Gentry* court also distinguished employer actions related to the need for political loyalty from actions based on other employee speech, such as that by an employee criticizing her employer's abuse of office. *Gentry*, 337 F.3d at 488-89. It cited a Seventh Circuit case holding that the "policymaking employee exception does not immunize public employer action unconnected to and unmotivated by need for political loyalty" such that "courts must apply *Pickering* balancing when the speech at issue does not implicate the employee's politics or substantive policy viewpoints." *Bonds v. Milwaukee Cty.*, 207 F.3d 969, 979 (7th Cir. 2000). Thus, it is not clear that the Fifth Circuit would apply the *McBee* mid-spectrum analysis for political patronage cases to mixed union speech and associational activity in non-political contexts, or in this case.[15]

---

[15] The Second Circuit has held that "the reasoning in the political patronage cases" is applicable to union membership cases. *State Emp. Bargaining Agent Coalition v. Rowland*, 718 F.3d 126, 134 (2d Cir. 2013). This appears to be based largely on its recognition that unions have historically been associated with political activity

The Court has not located any Fifth Circuit cases with mixed union speech and association claims to provide guidance on the proper analysis. In cases not involving political patronage or union activity, the Fifth Circuit has separately analyzed the speech and association retaliation claims, applying the applicable standard to each separately. Thus, for example, in *Wallace v. Texas Tech University*, 80 F.3d 1042 (5th Cir. 1996), *Finch v. Fort Bend Independent School District*, 333 F.3d 555 (5th Cir. 2003), and *Caleb v. Grier*, 598 F. App'x 227 (5th Cir. 2015), the Court separately analyzed the free speech claims, with the public concern requirement, and the free association claim, without a public concern requirement. However, the speech and associational activity in those cases was not intertwined or expressive association.[16] Further, Judge Mazzant from the Eastern District of Texas

---

and they are predicated on ideas of worker solidarity that are as much political as economic, such that public sector unions may be like political organizations and their positions on some employment issues may effectively be positions on public policy. *Id.* at 133-34 & n.7. However, *Rowland* involved only union association, not speech. And that Court has also recently noted that it is not clear that speech by employees in the role of union officers involving advocacy as to the terms and conditions of employment fits comfortably into either citizen or employee speech categories. *Lynch v. Ackley*, 811 F.3d 569, 582 n.13 (2d Cir. 2016). In addition, the Sixth Circuit has recognized that "union-related association . . . does not inherently touch on a matter of public concern." *Hamilton Cty. Educ. Ass'n v. Hamilton Cty. Bd. of Educ.*, 822 F.3d 831, 841 n.3 (6th Cir. 2016).

    The Third Circuit has applied both the public concern and the private citizen requirements in instances where the "associational claim is linked closely enough with [a plaintiff's] free-speech claim." *Killion v. Coffey*, 696 F. App'x 76, 78 (3d Cir. 2017) (citing *Gorum v. Sessoms*, 561 F.3d 179, 185 n.4 (3d Cir. 2009)). Thus, in a recent case involving freedom of speech and freedom of association retaliation claims in the union context, it found that "[t]he core of [the Officers'] freedom of association claim is the same as the freedom of speech claim, namely that [the Officers] were retaliated against for supporting the implementation of twelve[-]hour shifts," and it therefore held that both retaliation claims were subject to the *Garcetti* test. The Seventh Circuit has also analyzed intertwined union speech and activity together, applying the *Garcetti/Pickering* analysis. *E.g.*, *Graber v. Clarke*, 763 F.3d 888 (7th Cir. 2014). However, as noted, unlike the Fifth Circuit, these circuits apply a public concern requirement to both speech and association claims, thus bypassing the current difficulty.

[16] In *Wallace*, for example, a basketball coach at Texas Tech's speech was advising African-American players of their eligibility for financial assistance and how to handle discrimination in receiving assistance, and the association was having close, personal relationships with the players. The Court noted two types of protected associations: (1) the choice to enter into and maintain certain intimate human relationships and (2) the right to associate for the purpose of engaging in expressive activities protected by the First Amendment. The Court found that the speech did not satisfy the public concern requirement, and that the association was not protected by the First Amendment as an intimate relationship or was subject to limitations based on efficiency.

    In *Lane*, a school principal alleged that she was retaliated against based on her speech regarding a "school within a school" proposal and for her associations with members of the school board. *Lane*, 333 F.3d at

recently considered a retaliation claim based on union speech and association, and he separately analyzed the claims. *Mote v. Walthall*, No. 4:16-CV-00203, 2017 WL 2651705 (E.D. Tex. June 20, 2017). Similarly, Judge Barbier from the Eastern District of Louisiana separately analyzed speech and association claims related to union activity in *St. Tammany Parish Fire Dist. No. 3*, No. 17-1025, 2017 WL 1969641 (E.D. La. May 12, 2017).

Thus, the analytical landscape for Castilleja's First Amendment mixed union speech and association retaliation claims is less than clear. However, as noted, *Boddie* indicates the Fifth Circuit's position that when both speech and association are intertwined, there is no threshold requirement of public concern, as there is for a pure speech claim, and instead the issue of public concern is considered as part of the balancing. *Boddie*, 989 F.2 at 749.[17] Further, Castilleja contends that he was primarily targeted because of his association with the Union – his position as president and thus his role in the no-confidence petition, more so than any speech contained therein. Defendants appeared to concede in their Reply brief and at the hearing that public concern remains relevant, but is not a threshold requirement. Thus, at this point, the Court will not treat public concern as a threshold requirement, but will apply a balancing test taking into account public concern.

---

561. In *Caleb*, the speech claim was based on a refusal to agree with purportedly false accusations and the association was based on intimate/social relationships with colleagues.

[17] The Fifth Circuit cases create confusion on this, however. In *Vojvodich v. Lopez*, 48 F.3d 879 (1995), the employee alleged retaliation based on political speech and association. The Court stated that the employee must establish as a threshold that his speech or activity related to a matter of public concern, which associating with political organizations and campaigning unquestionably did. The Court then referenced the *Pickering* balancing test, but stated "[t]his analysis in reality is a sliding scale or spectrum upon which 'public concern' is weighed against disruption."

*Burnside v. Kaelin*, 773 F.3d 624 (5th Cir. 2014), a recent case, further confuses the analysis. There, the deputy sheriff, who was the chairman of a law enforcement political action committee, claimed retaliation because he did not support the sheriff's re-election bid. Thus, this case would seem to fall within the *McBee* spectrum. The Court set forth the different standards/tests for speech and association claims separately, and then asserted that the *Pickering* balancing test – which it stated was sometimes referred to as the *McBee-Pickering-Connick* balancing test -- applied only to the speech claim and not to the association claim "because that claim has no balancing-test requirement." *Id.* at 626 & nn.2, 3.

However, the Court concludes that the Fifth Circuit would continue to require that the speech be made in the capacity of a citizen rather than an employee. Under *Lane*, the first inquiry in a speech case is whether the employee was acting in his capacity as a citizen or as an employee and the second inquiry is then whether the speech involves a matter of public concern, taking into account the content, form, and context of the speech. Although Defendant has moved to dismiss only on the issue of public concern, Plaintiff spends a great deal of his briefing on the issue of whether he acted in his capacity as a citizen or employee. Plaintiff argues that Defendants cannot reasonably assert that Castilleja's pursuit of the Union petition in his new role as BCPOA president was an ordinary duty of his job as a probation officer, and that any reporting of improper conduct related to the petition is not a part of his ordinary duties.

Several cases from other circuits have held, post-*Garcetti*, that the speech of an employee acting in his capacity as a representative of a union is not made as an employee but as a citizen. The Seventh Circuit has held several times that a union representative's speech made in that capacity is citizen speech. *Oledzki v. Rossi*, 765 F.3d 742, 747 (7th Cir. 2014) ("Our circuit has consistently held that when a public employee speaks in his capacity as a union official, his speech is not within the purview of his 'official duties.'"); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006)(stating that *Garcetti* was "inapposite" because the plaintiff deputy sheriff's statements were made in the capacity of his role as union president, not deputy sheriff, though the topic was also one that he would not have commented on as part of his ordinary job duties). In *Graber v. Clarke*, 763 F.3d 888 (7th Cir. 2014), the union vice president spoke on matters of mandatory overtime and its possible effect on public safety, and

the Court stated, "The First Amendment does not protect a public employee's expressions made "pursuant to his or her official responsibilities," but if the public employee is speaking in his capacity as a union representative, he is speaking as a citizen. *See also Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (holding statements made in capacity as union official not subject to rule announced in *Garcetti*).

The Ninth Circuit has similarly held that speech made in the context of the plaintiff's role as a union official was made as a private citizen and did not fall under *Garcetti*'s strictures. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1059–60 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union.").

The Fifth Circuit's post-*Lane* opinion in *Gibson v. Kilpatrick* indicates it would reach the same conclusion because the focus should be on whether the employee was acting pursuant to his ordinary job duties, even if the speech occurs as part of a personal employment dispute. *Gibson*, 838 F.3d at 482 & nn.3-4. Thus, Plaintiff has sufficiently established at the pleading stage that his actions taken in his role as Union president were in the role of a citizen and not an employee. The fact that Castilleja may be required by Texas law to report certain misconduct does not alter this conclusion, since there is no indication that he was acting in that capacity, as part of his ordinary job duties for which he was paid, when he spoke on behalf of the union or suggested that he would not withdraw the petition.

With regard to the public concern requirement, the Fifth Circuit held in *Kinsey* that in a case involving mixed speech and association where public concern is not the first issue, "the

tests applied to determine whether speech is of such concern are instructive." *Kinsey*, 950 F.2d at 995. Thus, under any applicable standard, the public concern inquiry is similar. Speech or mixed speech and association involves a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. *Gibson*, 838 F.3d at 482. Public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *Id.*

The Complaint alleges that labor relations and departmental leadership at CSCD (including its administration and governance) are matters of public concern. It further alleges that "poor or corrupt or incompetent or inefficient administration of the CSCD, in all aspects including labor and employee relations, . . . potentially impairs public safety." Complaint ¶ 21. Plaintiff Castilleja bases his retaliation claim generally on labor relations at the CSCD and the Union petition, and asserts that Anderson targeted him because he was BCPOA president to punish him and to deter other union members.

Castilleja emphasizes that in *Boddie*, the Fifth Circuit stated in dicta that "speech in the context of union activity will seldom be personal; most often it will be political speech." *Boddie*, 989 F.2d at 750. However, merely because speech is related to union activity does not make it a matter of public concern as a matter of law. *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). The Seventh Circuit has noted that union activity, "in a broad sense, touches upon matters of public concern," but that does not automatically make the expression protected by the First Amendment. *Graber*, 763 F.3d at 895. Thus, the Seventh Circuit holds that if the union employee's speech demonstrates that he sought "to bring about change with public

ramifications extending beyond the personal," he was speaking on a matter of public concern. *Id.* (citing *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 986 (7th Cir. 2013)).

However, the Ninth Circuit broadly recognizes that collective personnel grievances raised by unions (as opposed to individual employee grievances) may be matters of public concern. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1057-58 (9th Cir. 2013). It thus held that a plaintiff who led a no-confidence vote by the police officers' union about the police chief made out a prima facie case that the no-confidence vote involved a matter of public concern. It noted that (1) the police chief did not contend that any of the grievances motivating the vote were individual as opposed to collective, (2) the record suggested that the police union's concerns were with the chief's leadership style and other department-wide problems, not private grievances, and (3) these departmental problems were of inherent interest to the public because they could affect the ability of the Sierra Madre police force to attract and retain officers.

The Court concludes that the Fifth Circuit would likely reject a broad categorical approach to union speech. The union activity and speech involved here is mixed public and private, and at this pleading stage, there are sufficient indicia of public concern to deny the motion to dismiss. As noted, public concern is not a threshold requirement for this mixed association and speech claim, but is evaluated as part of a balancing analysis. Because the Court is not presented with the necessary information to conduct the balancing test, specifically the disruptiveness portion of the balancing, dismissal would be appropriate only if there were no public concern at all to the Union's activities.

4.  Conspiracy Claims under § 1985

In Paragraph 161, Plaintiffs allege that Anderson and Brady conspired to deprive Castilleja of the equal protection of the laws "because of his lawful activities in support and promotion of Plaintiffs USW and BCPOA and the members thereof," in violation of 42 U.S.C. § 1985. Plaintiffs fail to specify the precise subsection of § 1985 that they are suing under, but their invocation of equal protection indicates that it is § 1985(3) because that section prohibits, among other things, conspiracies to deprive any person of equal protection of the laws. Defendants move to dismiss the § 1985 conspiracy claims against Anderson and Brady on the basis that the Fifth Circuit requires a showing of racial animus for § 1985(3) claims, and union animus is insufficient. *See, e.g.*, *Lockett v. New Orleans*, 607 F.3d 992, 1002 (5th Cir. 2010). Plaintiffs failed to respond to the motion to dismiss.

When the plaintiffs in *Simonelli*, including Castilleja, brought conspiracy claims under § 1985(3) previously, this Court dismissed such claims, stating that "§ 1985(3) does not provide a remedy for union membership based animus." *Simonelli v. Fitzgerald*, No. SA-07-CA-360, 2009 WL 3806489, at *7 (W.D. Tex. Oct. 22, 2009). The Order cited Supreme Court authority that § 1985(3) does not reach conspiracies motived by economic or commercial animus. Plaintiffs did not identify any more recent precedents that would persuade the Court to reach a different conclusion, and in fact conceded this claim at the hearing. Thus, this claim (¶ 161) is dismissed..

5.  Substantive due process name clearing claim

Castilleja asserts a substantive due process claim based on the fact that he was not permitted to clear his name of the assertion that he mishandled cases. To succeed on this

claim, Castilleja must prove the following: (1) that he was discharged, (2) that defamatory charges were made against him in connection with the discharge, (3) that the charges were false, (4) that no meaningful public hearing was conducted pre-discharge, (5) that the charges were made public, (6) that he requested a hearing in which to clear her name, (7) and that the request was denied. *Jimenez v. Harlandale Indep. Sch. Dist.*, No. 06-cv-135-XR, 2016 WL 1851718, at *7 (W.D. Tex. May 17, 2006). Defendants contend that Castilleja fails to state a claim because he has not alleged a stigmatizing statement or publication. Plaintiff failed to respond to the motion to dismiss this claim. Plaintiff conceded at the hearing that he cannot establish that any allegedly defamatory charges were made public. Accordingly, this claim (¶ 162) is dismissed.

   6.   Whether the Union has standing

In Paragraph 170, the Union asserts First Amendment claims for harm to itself and to its members, and seeks injunctive relief to restrain Anderson and those in privity with him from interfering with the right to associate (for the Union and its members) and compensatory damages for lost union dues (limited to just the Union and not its members and only against Anderson in his individual capacity). Thus, the union claims standing through both organizational standing and associational/representational standing.

First, through organizational standing, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizational standing is to be distinguished from associational standing (more descriptively termed representational standing) through which "[a]n association has standing to bring suit on

behalf of its members when [1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc*., 528 U.S. 167, 181 (2000). Defendants assert that the Unions cannot establish the requirements for either type of standing.

### a. organizational standing

For organizational standing, the Union must show: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*. at 180–81. The Union satisfies these requirements.

The First Amendment protects a public employee's right to associate with a union. This right encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government on their behalf. These rights flow to unions as well as to their members and organizers. *PACE v. El Paso Comm. College Dist.*, 730 F.3d 258, 262 (5th Cir. 1984) (quoting *Allee v. Medrano*, 416 U.S. 802, 8199 n.13 (1974)). Similarly, the First Amendment protects the right of associations to engage in advocacy on behalf of their members, and the government is prohibited from infringing upon these rights either by a general prohibition against certain forms of advocacy or by imposing sanctions for the expression of particular views it opposes. *Smith v. Arkansas State Hwy. Employees, Local 1315*, 441 U.S. 463, 464 (1979). The Supreme Court recognized in *Smith* that taking steps to

discourse union membership or association is an impairment that the Constitution prohibits. *Id.* at 466. Thus, the actions of a public employer "whose purpose is either to intimidate public employees from joining a union . . . or to retaliate against those who do" violates the First Amendment. *Hitt v. Connell*, 301 F.3d 240, 245 (5th Cir. 2002) (citing *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993)); *Mote v. Walthall*, No. 4:16-CV-00203, 2017 WL 2651705, at *5 (E.D. Tex. June 20, 2017).[18]

Defendants argue that the Union lacks organizational standing because its alleged injury, the drop in membership, is not fairly traceable to Anderson's decision to terminate Castilleja's employment. Defendants assert that the link is attenuated, at best, because it is premised on members feeling a subjective "chill" and acting upon it by dropping out of the Union. Plaintiffs do not directly respond to this argument. In their Reply, Defendants assert that Plaintiffs did not show traceability and cannot prove it through speculation.

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). The Union enjoys First Amendment protections, which it contends are being curtailed by Defendants' conduct. The Union alleges that Defendants fired the Union president with the intent to make an example of him, stop the Union's no-confidence petition, and deter and coerce employees from supporting the petition

---

[18] The question is whether a public employer has set out to injure or destroy an association of public employees for the purpose of preventing the exercise of their First Amendment rights. *PACE*, 730 F.3d at 262. Thus, in *PACE*, the fact that the complaint alleged that improper motives were behind the defendants' withdrawal of campus mail privileges and refusal to process grievances of PACE members according to the terms of its written procedure was sufficient to furnish grounds for relief to the union as part of, or even independent of, its basic claim of a general campaign to harass and retaliate against its members for exercising their rights of association. *Id.* at 263.

and the Union. The Union alleges that the chilling effect created by Anderson's discharge of Castilleja made Union members uneasy about asking other employees to join the Union and made members uncomfortable about signing the petition or soliciting further signatures on the petition, and that Union membership declined by approximately 30% or more, resulting in loss of dues. Complaint ¶ 121.

As it did in *Simonelli*, the Court finds that the Union has standing to assert its claims. *Simonelli v. Fitzgerald*, No. SA-07-cv-360-XR, 2009 WL 3806489, at *2 (W.D. Tex. Oct. 22, 2009). In *American Federation of Government Employees Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007), the Ninth Circuit found allegations that an employee's termination had a chilling effect on other employees from joining the union was sufficient to demonstrate injury in fact. "An action that invades an organizations' interest in recruiting members, obtaining funding, or collecting dues clearly hinders that organization's ability to function, and is an injury for purposes of standing." *Fair Housing Council of San Fernando Valley v. Rommmate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring); *see also Broderick v. City of Boston*, 755 F. Supp. 482 (D. Mass. 1991) (union had standing to sue for violation of its First Amendment rights by "alleging that its exercise of its own First Amendment rights has been chilled by the attacks upon its primary advocate, its president").

Further, the Court disagrees that the allegations are insufficient to establish that the injury is fairly traceable to Anderson's decision to terminate Castilleja. The Complaint fairly alleges that Defendants' actions directly interfered (as intended) with the no-confidence petition and with the Unions' ability to solicit membership and collect dues, and thus the injury is fairly traceable to Defendants' actions against Castilleja. This is sufficient to show

traceability at the pleading stage. Accordingly, the Union's claims in ¶ 170 are sufficient to demonstrate organizational standing and to allow the Union to seek relief.

   b.  *representational standing*

In Paragraph 170, the Complaint alleges that Anderson violated all the Plaintiff Union members' rights of freedom of association by discharging Castilleja and through the chilling effects that Anderson visited upon the members. The Complaint seeks injunctive relief on behalf of all Plaintiff Union's members working in the employment of CSCD presently and in the future against Anderson and those in privity from interference, restraint, or coercion in the exercise of their rights to associate with the Union.

Defendants contend that the Union members lack an injury. The first requirement for representational standing requires the Union to "allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Defendants argue that a mere allegation of self-censorship or a subjective "chilling effect" is insufficient to state an injury-in-fact, citing *Younger v. Harris*, 401 U.S. 37, 51 (1971) and *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that an incidental chilling effect on First Amendment rights from a generally applicable criminal statute regulating expression was insufficient to justify federal intervention. In *Laird v. Tatum*, 408 U.S. 1 (1972), the plaintiffs alleged that the intelligence-gathering operations of the U.S. Army "chilled" the exercise of their First Amendment rights because they feared that the defendants might, in the future, make unlawful use of the data gathered. The Supreme Court held that the

respondents' assertion that they were "chilled" in their political expression was insufficient to show injury. The Court characterized their claim as "the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights" and held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13-14.

However, *Laird* does not stand for the proposition that a chilling effect is never a sufficient injury. *Laird* distinguished cases in which the complainant was presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging. *Id.* at 11. It also noted that the plaintiffs were not complaining that the effect was caused by a specific action of the Army against them, but only by the existence and operation of the intelligence gathering system. *Id.* at 3. The Union alleges that Anderson intended to chill its members' associational and speech activities by targeting the Union president to make an example of him. The Complaint fairly alleges that Union members (1) are presently engaging in the type of activity that Anderson is allegedly targeting, (2) are presently feeling a chill of their First Amendment rights due to Anderson's acts of intimidation in the form of uneasiness about asking other employees to join the union, soliciting further signatures on the no-confidence petition, and being afraid to sign the petition themselves, and (3) are among the specific group that would be affected by Anderson's future actions of intimidation or retaliation. This is more than a "subjective chill" that has been held insufficient to confer standing. Plaintiffs' allegations are sufficient at the pleading stage to substantiate their claim

that the challenged conduct has deterred them and will continue to deter them from engaging in protected activity.

The third prong of associational standing requires a showing that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Defendants argue that individual participation is required because the retaliation claims require pleading and proof that the members engaged in protected activity, that Anderson subjected each, or at least some, to an adverse employment decision, and that this activity motivated Anderson's actions. Defendants argue that these elements are fact-intensive, unique to each individual member, and will require each member to participate. Defendants contend that the "union should not be allowed to use this individual case of alleged wrongful termination to conduct unbridled discovery in an attempt to build the case for which they request" broader injunctive remedies. Docket no. 8 at 16.

Defendants' arguments fail to differentiate between union members' intimidation claims and Castilleja's retaliation claim. Plaintiffs' claims are that Anderson retaliated against Castilleja and *also* that Anderson chose to make an example out of Castilleja in order to intimidate other union members. The Fifth Circuit has recognized that the First Amendment is violated by state action whose purpose is *either to intimidate* public employees from joining a union or from taking an active part in its affairs *or to retaliate* against those who do. Plaintiffs are not arguing that all union members were retaliated against, and thus they do not need to prove the elements of a First Amendment retaliation claim for all the members. Rather, they allege that union members were intimidated, intentionally, by Anderson's actions in

targeting/retaliating against Castilleja. As discussed above, the pleadings are sufficient to establish an injury to the members for which they could themselves sue.

Further, under this prong, associational standing fails where the nature of the claim or relief sought is not common to all members of the association or shared in equal degree, such that "both the fact and extent of injury would require individualized proof." *Warth*, 422 U.S. at 515-16. At this point, the Union has dropped its claim for money damages on behalf of its members and seeks only prospective injunctive relief against Anderson in his official capacity. When an association seeks only prospective injunctive relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. *United Food & Comm. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554 (1996). Thus, "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members. *Id.* at 546. The Court finds that the Union has representational standing to pursue injunctive relief. Even if it does not, the same claim and relief are encompassed within its claim under its organizational standing, and thus separate representational standing would appear unnecessary.

7. Whether the Union has failed to state a claim upon which relief can be granted

Defendants argue that, even setting aside standing and immunity, the Union fails to state a viable cause of action because (1) it fails to allege the *prima facie* elements of an association claim for each member by failing to allege that they engaged in protected activity or suffered an adverse employment action, (2) it fails to set forth a claim for relief under any

theory of equal protection, and (3) it fails to allege any element of a due process claim (either procedural or substantive due process).[19]

The first argument is relevant only if the Union is asserting claims for retaliation on behalf of each of its members, which, as explained, it is not. Although it is asserting that Castilleja was retaliated against, it is asserting claims for anti-union intimidation with respect to the other members (*i.e.*, Anderson terminated Castilleja to intimidate other union members). It is sufficient to allege that its members were engaged in protected union associational and expressive activity and have been intimidated or "chilled" from engaging in union activity by Anderson's intentional acts of intimidation. The Court finds that the Complaint adequately states a claim at the pleading stage.

The second and third arguments challenge Paragraph 172, in which the Complaint asserts a claim alleging that Anderson's causing institutional injury to the Union deprived it of due process and equal protection. At the hearing, the Court questioned Plaintiffs' counsel about the specifics of the due process claim, but Plaintiff never explained the basis for this claim. Accordingly, the Court finds that the Union has failed to state a due process claim.

However, Plaintiffs' counsel did sufficiently explain the basis for its equal protection claim – specifically, that other union associations are treated more favorably than Plaintiff Union. To state a claim under the Equal Protection Clause, a § 1983 plaintiff may allege that a state actor intentionally discriminated against her because of her membership in a protected class. *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999). Union membership is not a protected class. *Ramirez v. Rendon*, No. B-14-179, 2015 WL 10437815, at *8 (S.D. Tex. Dec.

---

[19] Defendants assert in various footnotes that their arguments apply equally to the claims brought under the Texas Constitution, citing *Johnson v. Houston Indep. Sch. Dist.*, 930 F. Supp. 276, 288 (S.D. Tex. 1996).

7, 2015). However, a plaintiff may also establish an Equal Protection Clause violation by alleging different treatment from others similarly situated and that no rational basis existed for such treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This is sometimes referred to as a "class of one" claim. *Id.*; *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (union members could assert *Olech*-based equal protection claim alleging that they were treated differently from similarly situated persons with no rational basis for the different treatment). At the pleading stage, the Union has sufficiently alleged class-of-one disparate treatment.

8. Witness coercion due process claim

In Paragraph 174 of the Complaint, all Plaintiffs assert that Anderson violated their right to due process under the Fourteenth Amendment by allegedly coercing a witness (Joel Merino) against testifying in this action, and Plaintiffs seek "appropriate restraint and injunction."[20] The Complaint alleges that, at the time Merino voiced his disagreement with Anderson's decision to discharge Castilleja, Merino's work location was within a convenient, short distance from his home, but that Anderson later transferred him to a different location much farther from his home and "almost simultaneously threatened supervisor Merino's wife, also a CSCD employee, with adverse employment action." Compl. ¶ 122. Plaintiffs allege that Anderson has known since at least January 2017 that this suit would be filed, and his actions were an attempt to deter Merino (and other employees) from testifying in this action. Compl. ¶ 123.

---

[20] The Complaint does not specify whether this claim is asserted against Anderson in his individual or official capacity. Because Plaintiffs voluntarily dismissed their claims for injunctive relief against Anderson in his individual capacity, the Court presumes this action is against Anderson in his official capacity.

Defendants assert that Plaintiffs fail to set out the necessary elements of this claim and that Plaintiffs lack standing because the injury – the witness not testifying in the case – has not yet materialized. Plaintiffs do not respond to the motion to dismiss this claim. However, at the hearing, Plaintiffs' counsel asserted that he was not abandoning the claim. Although the fact that Merino has not yet failed to testify is likely insufficient to require dismissal of this claim, the Court agrees that Plaintiffs have failed to allege the specific legal contours of this claim insofar as generally asserting infringement of their due process rights does not satisfy the specificity requirements of *Twombly*.[21] This claim is dismissed with leave to replead.

9.  Texas Labor Code § 101.001

In Paragraph 171, the Union asserts a claim under Texas Government Code § 101.001 against Anderson for injunctive relief. That section provides that "All persons engaged in any kind of labor may associate and form trade unions and other organizations to protect themselves in their personal labor in their respective employment." Defendants assert that the Union's claim under Texas Labor Code § 101.001 must be dismissed because this statute provides no private right of action. Plaintiffs do not respond to the motion to dismiss this claim. As this Court noted in *Simonelli*, it "reads more like a policy statement" than a cause of action because "no remedies are provided for any violation and no provisions are set forth as to who may bring suit." Plaintiffs have provided no authority to convince the Court to reach a different conclusion. But in any event, this claim has already been dismissed insofar as

---

[21] The Court notes that 28 U.S.C. § 1985(2) makes actionable a conspiracy to obstruct justice by conspiring to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully. However, the Complaint does not allege a conspiracy. Nor have Plaintiffs alleged an interference with their access to the courts. *See Ryland v. Shapiro*, 708 F.3d 967, 974 (5th Cir. 1983).

Plaintiffs dropped their claim for injunctive relief against Defendants in their individual capacities and the official capacity claims are barred by the Eleventh Amendment.

     10. <u>Texas Government Code § 617.004</u>

In Paragraph 171, the Union asserts a claim under Texas Government Code § 617.004 against Anderson for injunctive relief. That section provides that "[a]n individual may not be denied public employment because of the individual's membership or nonmembership in a labor organization." Defendants assert that the Union's claim under Texas Government Code § 617.004 must be dismissed because it provides that an individual may not be denied public employment because of the individual's membership or nonmembership in a labor organization and none of the Union's members have been denied employment. Plaintiffs do not respond to the motion to dismiss this claim. The Court agrees that no union member has been denied employment other than Castilleja. In any event, this claim has been dismissed insofar as Plaintiffs dropped their claim for injunctive relief against Defendants in their individual capacities and the official capacity claims are barred by the Eleventh Amendment.

<strong>Conclusion</strong>

The motion to strike (docket no. 7) is DENIED and the motion to dismiss (docket no. 8) is GRANTED IN PART AND DENIED IN PART.

All parties agree that Plaintiffs may not seek judicial relief based on any alleged actions occurring before December 7, 2015 and thus outside the statute of limitations.

All claims against Defendant Bexar County Community Supervision and Corrections Department are DISMISSED. The official-capacity claim for monetary damages in ¶ 170 is dismissed. All claims for injunctive relief against Anderson and Brady in their individual

capacities are dismissed. Because all state-law official-capacity claims are barred by the Eleventh Amendment, the state-law claims asserted in ¶¶ 163, 164, 165, 166, 171, and 173 are dismissed. The § 1985(3) conspiracy claim (¶ 161) is dismissed. The substantive due process name-clearing claim (¶ 162) is dismissed. The due process claim contained in ¶ 172 is dismissed. The witness coercion due process claim in ¶ 174 is dismissed with leave to replead.

The motion to dismiss is otherwise denied. Thus, the remaining claims are contained in ¶ 157 (Castilleja's First Amendment retaliation claim against Anderson in his individual capacity), ¶ 158 (Castilleja's First Amendment claim against Anderson in his official capacity seeking reinstatement), ¶ 160 (Castilleja's First Amendment claim against Brady in his individual capacity), ¶¶ 167-168 (Castilleja's claim under Texas Labor Code § 101.301 against Anderson and Brady in their individual capacities), ¶ 170 (the Union's claims under the First Amendment), and ¶ 172 (the Union's equal protection claim). If Plaintiffs choose to replead, they must file an Amended Complaint within fourteen days of this Order.

It is so ORDERED.

SIGNED this 15th day of June, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE