**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, ET AL., | § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No.  SA-17-CV-1242-XR |
| v. | § § | |
| JARVIS ANDERSON, ET AL., | § § | |
| *Defendants.* | § § | |

**ORDER**

On this date, the Court considered Plaintiffs' Motion for Partial Summary Judgment (docket no. 66) and Defendants' Motion for Summary Judgment (docket no. 78) and the responses and replies thereto.

**I. Background**

The lawsuit arises out of Plaintiff Sergio Castilleja's termination from his job as a community supervision officer ("CSO") in January 2017 following a proposed adverse action ("PAA") issued in August 2016. Defendants contend Castilleja was terminated due to serious neglect of his basic job responsibilities, placing probationers and the community at risk. Plaintiffs, on the other hand, contend he was terminated because of his protected union and speech activity as a member and President of the Bexar County Probation Officers Association ("BCPOA").

Castilleja[1] sues the Director of Bexar County Community Supervision and Corrections Department ("CSCD"), Jarvis Anderson, and Deputy Director Brian Brady for retaliation in violation of the First Amendment and for violation of Texas Labor Code § 101.301. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), United Steelworkers Local Union 9528/BCPOA (collectively, "the Union"), also sue, alleging that Defendants' intimidating actions caused a decline in membership and chilled its members' speech in violation of the First Amendment. The Union also alleges an equal protection claim based on alleged disparate treatment from other employee associations. Castilleja and the Union assert a claim for conspiracy in violation of § 1983 and witness tampering in violation of § 1985(2).[2]

Plaintiff Castilleja served as a Steward for the Union from 2007 until January 28, 2016, when he was elected president of BCPOA. Defendant Jarvis Anderson was chosen by the Bexar County Judges as the CSCD Director in 2010.[3] Defendant Brady became Deputy Director on January 1, 2017 and was previously Assistant Chief.

In October 2011, Castilleja was suspended pending termination for an altercation with another CSO and Union member. Both employees received criminal citations and were placed

---

[1] After this lawsuit was filed and the pending motions for summary judgment were filed, Sergio Castilleja passed away. The case was stayed to allow substitution of Emily Ann Caroline Castilleja and Trisha Cantu, as next friend of Castilleja's minor daughter, and then briefing on the motions was resumed. For ease of reference, the Court will continue to refer to the Plaintiff as Castilleja.

[2] After a hearing and consideration of Defendants' motion to dismiss and Plaintiffs' concessions, this Court previously dismissed Plaintiffs' claims against the CSCD and various additional claims against Anderson and Brady. Docket no. 29. The listed claims are the live claims at this time.

[3] Castilleja and Sheri Simonelli sued the prior Director, William Fitzgerald, in 2007 alleging unlawful retaliation, and that case was before this Court as *Simonelli v. Fitzgerald*, SA-07-CA-360-XR. Simonelli also sued for wrongful termination, and that case was before this Court as 08-CV-648-XR, and was consolidated with 07-CA-360-XR. In May 2010, the consolidated actions were settled. Simonelli was reinstated and continued to work at CSCD during the events in question in this lawsuit.

on administrative leave. Brady investigated the incident and, following his investigation, issued a report recommending that both employees be terminated. Docket no. 78-2. However, Anderson gave them both second chances and allowed Castilleja to return to work in January 2012. Castilleja depo. at 151-52; Docket no. 96-10. Anderson notified Castilleja that he would be "placed under a zero tolerance for any infraction of our administrative policies and case management procedures" and "[a]ny deviation will cause your immediate termination of employment." Docket no. 78-2; Docket no. 78-5 at 119 (Anderson Decl.); Castilleja depo. at 227. Castilleja understood that if there was any further violation of administrative policies or case management procedures, he could be terminated immediately. Castilleja depo. at 228.

In July 2014, the Union submitted a letter and petition on behalf of the Union to the Bexar County Administrative Judges requesting that the Judges investigate and evaluate Chief Anderson. Docket no. 78-2 at 25-26; Docket no. 66-2. Anderson received the letter at the time. Anderson depo. at 12.

In December 2014, the CSCD reorganized from one central location to regional satellite offices. As part of this transition, Castilleja was assigned to the new Central 3 Unit, with John Escalante as his manager. Before he started at Central 3, Castilleja had requested a transfer to the Northwest Unit under Joel Merino's supervision but his request was denied. Within a few months, the CSCD began to transition to certain specialized caseloads, and Escalante selected Castilleja to transition to a DWI-heavy caseload (over Castilleja's objection) because Escalante felt he was the best candidate for that position given his long tenure, his intellect, and his knowledge. Escalante depo. at 30-35. Castilleja preferred a mix of

cases or predominantly assault cases, but Escalante denied this request. Escalante depo. at 18-21, 31, 36. As time went on, Castilleja worked mostly DWI cases. *Id*. at 32.

Escalante wrote a memo to Assistant Chief Sloane Kelly on January 22, 2015 about his concerns with Castilleja's time management. Docket no. 78-5 at 132 (Kelly Decl.); Docket no. 96-17. Escalante noted that Castilleja was scheduled to work 8 to 5 but consistently stayed over almost every day, and he told Castilleja he needed permission as per policy for each overtime event. Escalante wrote, "During our conversation he made some interesting comments about being the Union Steward and having to do Union work during the day. He stated that he clocks out for those events, but I did not see any such thing on his Web Clock data screen. He further stated that he has to keep defendants waiting in the lobby while he does his Union Business, so, he needs to stay later to make up the time. Mr. Castilleja has clocked out as late as 8:30 p.m. which poses so many other liability and safety issues."

Escalante indicated his desire to write up Castilleja and asked for Kelly's assistance in investigating Castilleja's productivity during his hours after 5 p.m. Docket no. 78-2 at 41. Kelly states she was concerned about Castilleja's total disregard for policy and the chain of command and took her concerns to Anderson, recommending an adverse employment action including termination in February and March 2015. Docket no. 78-5 at 132. On February 10, 2015, Kelly reported to Anderson about Castilleja's unapproved overtime and the fact that, on most days he had not accessed case records (or accessed only 1 to 3) during his overtime or had sent no emails or only personal emails. Docket no. 78-5 at 133-40. She sent a similar letter on March 9, 2015 about his continued violations. Docket no. 78-5 at 139.

In mid-March 2015, Escalante complained in a written letter to Lewis about Castilleja, noting that he displayed a hostile attitude at a meeting, particularly when having to explain his excessive overtime and that he "made statements that he needed to conduct Union business, as the Union Steward, during work hours and that was a main factor in why he worked late." Docket no. 78-2 at 42-43; Docket no. 96-18. Escalante told him to refrain from conducting Union business during work hours, to refrain from working past 6:30, and to obtain permission when he needed to work late. Escalante noted that Plaintiff had continued to work overtime almost every day despite instructions. Escalante wanted to take action to address Castilleja's "blatant disregard for our department's policies and procedures." *Id.* at 44. On March 19, 2015, Lewis drafted a Notice of Proposed Adverse Action based on these violations. Docket no. 78-3 at 4.

Anderson declined to issue the PAA or terminate Castilleja's employment and instead Castilleja received a written counseling and corrective action form on April 15, 2015. Docket no. 78-2 at 49; Docket no. 78-5 at 119 (Anderson Decl.); Docket no. 96-16. The counseling was for overtime violations, participation in other organizations/associations policy violation, and disciplinary procedure violation- insubordination. Docket no. 78-2 at 46. The counseling notice stated that Castilleja worked unapproved overtime on 65 separate occasions without required approval from December 15, 2014 to April 15, 2015. It also noted that Castilleja had stated he needed to "conduct non-department business while on the clock, which is against our policies, and, once again, claimed your overtime was to catch up on case management issues." *Id.* at 46. It noted that he had been "given firm instruction to discontinue conducting non-department business during work hours," and a "review of the Case Management System

shows you have completed very minimal case work during those periods of overtime which negates any business necessity for incurring the accumulated overtime." *Id.* It also noted the participation in other organizations/associations as follows: "Employees may participate in other organization/association activities provided that it is a voluntary action on their part and they do not engage in such activities while on duty." *Id*. at 47. Castilleja refused to sign the counseling and corrective action form.

On April 20, 2015, Castilleja received a Performance Improvement Plan of Action ("PIP") based on failure to meet the reasonable expectations of the department and violating several policies, including participation in other organizations/associations, use of overtime and compensation time, work schedule, attendance policy, and disciplinary procedures. Docket no. 78-2 at 51. This detailed the same infractions as the written counseling and corrective action form. Castilleja refused to sign. Defendants contend that Plaintiff continued to violate the overtime policy.

In November 2015, Escalante gave Castilleja a required annual performance appraisal for the time period October 1, 2014 to September 30, 2015. Docket no. 78-2 at 34-39. The overall rating was "satisfactory performance meets standards." However, Castilleja received the lowest possible rating in numerous categories, including "actively participates in team endeavors," "prevents or resolves conflict," "accepts and incorporates constructive feedback," "follows departmental policies and procedures," "requests leave time in a  proper and timely manner," and "requests managerial staffing of cases as appropriate." Escalante identified several areas needing improvement, including "unmotivated to participate in team endeavor," "communicating with manager," and "following policy," specifically time management (work

8-5, ask to work past 5:00 p.m.); reporting violations to court; and obtaining approval for reporting every 60/90 days.

Escalante also gave the highest score for "assists others when needed," "communicates ideas to improve procedures, techniques, and processes in accordance with department initiatives ('Thinks outside the box.')," "manages direct and indirect caseloads to established standards," and "prepares cases for discharge in a timely and appropriate manner." For Castilleja's strengths, Escalante wrote "specialized skill set – DWI caseload," "assists others in time of need or crisis," "thinks outside the box," "provides feedback," "always willing to work beyond scheduled time off," "compassionate," "takes the initiative to perform his job duties without prompting," "well organized," "high work ethic," "sought out by peers for advice and direction," and "expeditiously resolves unexpected emergency issues as they come." Escalante wrote that Castilleja is "extremely experienced, wise, intelligent, and knowledgeable. He offers his suggestions and thoughts to improve the department. He is an asset to our unit and to the department as a whole. His assistance is required to make minor improvements which will only strengthen his performance and our unit."

Escalante further wrote that Castilleja "worked hard to keep up with the daily demands of his caseload and the transitions the department was going through" but "as time passed, it became evident that [he] was saturated with daily tasks and inadvertently failed to follow all requirements per policy." He wrote, "He is aware of his deficiencies and is working hard to make the necessary corrections. He is committed and motivated to improving his work performance."

7

Escalante later testified that he wrote the positive portions because he wanted to encourage Castilleja and not "slam him." He further testified that he would not have written those positive things or given a meets standards rating had he known then what he later learned about Castilleja's serious case management deficiencies. Escalante depo. at 159-63. He no longer believed that Castilleja had strong case management skills because "it became self-evident . . . shortly thereafter in February that he was mismanaging his caseload." Escalante depo. at 162. He testified that although he was aware of some deficiencies, he could not know as Castilleja's manager about the serious deficiencies that were occurring because he supervised 3000 cases via his officers and relied on a tenured officer to follow policy and procedures. Escalante depo. at 68-69. He relied on CSOs to report violations, or he would not know they happened, and he further stated that Castilleja had changed one probationer from direct to indirect which pulled it off the manager's radar. Escalante depo. at 68-69, 165.

According to Castilleja, in late 2015, BCPOA determined to go forward with another initiative to call attention to its concerns with Anderson's leadership by circulating a second no-confidence petition. Castilleja became President of BCPOA in January 2016. At this point, no petition had been drafted. Castilleja depo. at 190. According to Castilleja, Anderson approached him about withdrawing the second initiative, which he had heard about from Union member Sheri Simonelli, and Castilleja declined to do so. Castilleja depo. at 186-87. Castilleja testified that Anderson said, "I want to start new. I want you to consider withdrawing it." *Id.* at 187. Anderson admits going to talk to him to offer congratulations and "wanting a fresh start," but flatly denies Castilleja said anything about the Union having voted

to pursue a no-confidence petition or his asking Castilleja to withdraw it, though he did recall Castilleja saying something about going forward. Anderson depo. at 124-26.

Simonelli had two telephone calls with Anderson in February and March of 2016. Simonelli testified that she remembered calling Anderson to discuss the Union's no-confidence vote and issues that were being brought to her on certain Bexar County facilities. Simonelli depo. at 222, 248. Simonelli sent herself an email summary of her recollection of the conversations in September 2016 because she was upset that Castilleja was fired when he did not need to be fired, though she agreed his casework "doesn't look stellar." Simonelli depo. at 230, 234. She wrote that in the February call she had told Anderson the members were upset and a grievance/no-confidence vote was forth-coming, and Anderson expressed that he hated Castilleja and told Simonelli that he was going to "go after Sergio hard." Docket no. 96-26. She wrote that in the March call she told him about the continuing issues with the facilities and reiterated that this was one of the Union's complaints and Anderson said "Sergio was not going to be heard and had better watch out." *Id.*; Docket no. 66-4 (Ex. 11). Anderson agreed that Simonelli told him there were officers in the department who were upset with him. Anderson depo. at 127. Anderson denied saying he would go after Castilleja hard or get him or that Sergio better watch out or that he hated Castilleja. Anderson depo. at 140-41.

In early February 2016, Anderson authorized a transfer for Castilleja from Central 3 to Northwest under Merino's management (as Castilleja had previously requested) to replace Lyndsey Barrera-Fermin, who also had a DWI caseload and had asked to be transferred from Northwest to Central 3.  Docket no. 96-2 (February 4 Anderson email to Escalante and Martin to advise Castilleja he would replace Barrera-Fermin at the NW location); Docket no. 78-2;

Docket no. 78-5 at 126 (Fermin Decl.); Castilleja depo. at 35 (Castilleja had repeatedly requested to transfer and Anderson gave him the move).

When CSOs transfer, the Department typically performs an audit of 20-25% of their cases, but Anderson and Brady waived the transfer audit for Castilleja and Barrera-Fermin because the audit team had numerous projects pending and Barrera-Fermin did not have a full caseload at Northwest yet.  Docket no. 78-3 at 3; Docket no. 78-5 at 120 (Anderson Decl.); Anderson depo. at 70-71; Brady depo. at 42; Docket no. 96-2 (Brady email that he was waiving the transfer audit requirement for Barrera); Docket no. 96-3 (email from Bridget Guzman to Christina Jasso, "Per Chief, due to the numerous audit projects going on right now, you can disregard the transfer audit on Castilleja's caseload). Castilleja was not in Brady's chain of command before he transferred to Northwest 5, though he had been previously when he worked under Merino at Central. Brady depo. at 45-46. The only time Brady had encountered Castilleja previously was in 2011 with regard to the physical altercation with another CSO, where Brady investigated the incident. Brady depo. at 46.

Barrera-Fermin assumed Castilleja's former caseload at Central 3 on February 11, 2016. Docket no. 78-5 at 126. Castilleja asserts he prepared a list of cases that had issues requiring immediate attention and provided the list to Escalante and Barrera. Castilleja depo. at 213 (Castilleja told them "these cases need to be worked on" and they were "a hot mess"). Escalante denies receiving any such list. Escalante depo. at 151.

According to Barrera-Fermin, she immediately "found serious case management issues requiring immediate correspondence to the court," including failure to notify the court of violations with probation conditions and the alteration of conditions without court approval.

10

Docket no. 78-5 at 126 (Fermin Decl.). Because of the seriousness of the issues, Barrera-Fermin brought the issues to Escalante's attention. Docket no. 78-3 at 7-8 (Escalante Decl.). Escalante states that many cases were not handled appropriately as per policy or procedure, and, for example, they found "that many of the cases were lacking court approval for action taken by Mr. Castilleja that otherwise required court action" and he "was also failing to hold probationers accountable for conditions of probation." Docket no. 78-3 at 7-8 (Escalante Decl.). Escalante testified that the negligence in one case was so significant it was deemed necessary to speak to the judge of the court in chambers, and Escalante personally went to apologize. Escalante depo. at 148.

Soon after February 12, Escalante notified his supervisor, Assistant Chief Andrea Martin of the issues. Escalante depo. at 104. Martin and Escalante eventually spoke with Brady, Castilleja's now second-line supervisor in Northwest, and Brady began to coordinate a review of Castilleja's caseload. Docket no. 78-5 at 123 (Brady Decl.); Docket no. 78-3 at 7 (Escalante Decl.). Brady instructed Escalante and Martin to review the Central 3 cases and take corrective action with the courts, and put together a list of discrepancies and errors they found. Docket no. 78-3 at 7 (Escalante Decl.); Docket no. 78-3 at 9 (Brady Decl.); Brady depo. at 52.

Anderson was made aware of the issue on February 16, 2016, when Judge Catherine Torres-Stahl brought to his attention that there were deficiencies discovered in Castilleja's Central 3 caseload. Docket no. 78-5 at 120 (Anderson Decl.). Anderson directed Lewis to have Castilleja's Central 3 cases audited by the audit team. Docket no. 78-5 at 120 (Anderson Decl.). On February 16, Lewis directed Christina Jasso, the head of the audit team, to audit

11

100 of Castilleja's cases per Anderson's instruction. Lewis depo. at 19-21; Docket no. 78-3 at 11. This audit was completed on March 15, 2016 and Jasso provided the results to Escalante. Jasso depo. at 19, 21-22.

Escalante reviewed Castilleja's caseload. Docket no. 78-3 (Escalante Decl.). He testified that "there was a pattern that was observed with Lyndsey on a daily basis bringing one or two cases of violation reports that should have been handled by" Castilleja and that became an overwhelming amount on a daily basis. Escalante depo. at 67. He stated that Barrera-Fermin would not know all the deficiencies immediately upon taking over the caseload, but as defendants would come in and files were pulled and "[a]s time went on, things flowed in an it became greater and greater and greater." Escalante depo. at 105.

On May 16, 2016, Escalante provided his supervisor Martin a list of ten cases Castilleja handled improperly, utilizing a written counseling record form. Docket no. 97-3 at 15 (sealed). Escalante testified that these were the most egregious case management deficiencies that he had ever seen. Escalante depo. at 68. He stated, "These are only 15 [*sic*] cases. I could have brought a hundred." *Id.* at 69. He provided this information on a written counseling form because that was an available template and "the only formal medium [he] had to utilize," but he testified that he did not intend to issue a written counseling as a disciplinary measure. Escalante depo. at 154-55; Brady depo. at 108. Escalante did not make any recommendation as to discipline. Brady depo. at 108. Brady received Escalante's written counseling and recalled that Escalante "found ten to fifteen cases with serious issues that could not be explained as simple error" but "could only be attributed to deliberate indifference to policy and procedure on Mr. Castilleja's part." Brady made notes on the written counseling

form document and then proceeded to review Castilleja's cases in the case management system. Brady depo. at 109-110; Docket no. 97-3 at 15 (sealed). Brady alerted Anderson that he would be looking at each of the cases and doing a case file review on them. Brady depo. at 109-110. Anderson did not direct Brady's review. Docket no. 78-5 at 120 (Anderson Decl.).

Brady compiled portions of the relevant computer files into a separate document and summarized the records as to certain probationers. Docket no. 78-5 at 124 (Brady Decl.). Brady concluded that termination was appropriate because "the errors . . . were not minor or insignificant. It was a blatant disregard to instructions from the judges or the courts. It was gross negligence in the management of these cases, the documentation of errors, the reporting of violations to the courts, and a total disregard for the protection of the community." Brady depo. at 111. Brady testified that this was sufficient grounds to recommend termination, and he decided to recommend termination as he wrapped up his Central 3 review in mid-July 2016. Brady depo. at 107, 112.

Brady testified that his decision to recommend termination was based solely on his review of the ten Central 3 cases, but the results of the review of those cases caused him concern that Castilleja might be managing his current caseload at Northwest in the same manner. Brady depo. at 113. Brady reviewed a sampling of Northwest cases through the end of July, finding "Castilleja had continued to make the same bad decisions." Docket no. 78-3 at 9 (Brady Decl.); Brady depo. at 112. Brady testified that he did not discuss the issue with Moreno, Castilleja's current supervisor. Brady depo. at 111-12. Nevertheless, Merino testified that Brady called him into his office to discuss Castilleja, and asked him "to find something in Sergio's caseload." Merino depo. at 37, 71. Merino also testified, "He . . . asked me about

13

Sergio's stuff, about doing stuff on and off the clock with the union, and I told him that I had told him what he instructed me to do is if you're going to do stuff on the – about the union on the – do it off the clock." *Id.* at 72-73. Merino testified Brady "told me that Jarvis wanted him gone because of the union stuff." *Id.* at 74-75. Brady did not explain what he meant by "union stuff." *Id.* at 75. Merino told Brady he wanted no part of it "because there's no validation to it." *Id.* at 76-77.

Around this same time, in July 2016, Castilleja had completed drafting the no-confidence petition and began to circulate it. Castilleja depo. at 193-94. Castilleja characterized the issues raised in the petition as matters of public safety because each impacted the ability of CSOs to supervise probationers. Castilleja depo. at 197. Castilleja contends management was aware he was circulating the petition.

Based on his reviews, Brady was "appalled." Brady depo. at 139. Brady testified he decided to recommend termination based solely on his review of the case files (not the audit results). Brady depo. at 113, 120-21, 140. Anderson agreed with Brady's recommendation to terminate and authorized proceeding with the PAA. Anderson denied that this was in any way based on Castilleja's role with the Union or any speech. Docket no. 78-5 at 120 (Anderson Decl.).

On or about August 1, 2016, Brady provided Lewis with his findings (including case summaries of ten Central 3 cases and five Northwest 5 cases) and recommendation to terminate, and Lewis typed them into the PAA. Lewis depo. at 32-34, 85; Brady depo. at 112, Docket no. 78-3 at 12.[4] Lewis included Brady's 15 written case summaries verbatim in the fact

---

[4] The Department issued an Amended Statement of Facts to correct some errors on the cause numbers on October 6, 2016 in response to asserted errors pointed out by Plaintiffs' counsel. Docket no. 78-3 at 21-26; Docket no. 96-13; Brady depo. at 107. Anderson wrote to Van Os that "[t]he 15 cases provided were only a fraction of Mr.

section spanning the first six pages. Lewis, on his own initiative, included other policy violations for background purposes. Lewis depo. at 34, 71 ("Mr. Brady provided me the case management information. I provided the other information. . . . He did not provide any input on that."); Docket no. 78-5 at 120 (Anderson Decl. stating Lewis had not discussed with him that he added further policy violations to the notice beyond the case management issues). These included reference to the April 15 PIP for substandard performance and non-compliance with policies and activities related to the union (such as attempting to coerce staff to participate with the association through manners deemed intrusive and using work email and technology to conduct unofficial association business). Docket no. 78-3 at 18.

On August 5, 2016, Brady gave Castilleja the PAA recommending termination, placed him on administrative leave pending appeal, and escorted him out. Castilleja testified that he told Brady he felt he was being retaliated against because of the no-confidence petition, and he was not sure if Brady knew about the petition before then. Castilleja depo. at 278-79. Castilleja contends that the 10 cases he told Escalante about were on the PAA and he "felt there was a connection to get me out." *Id.* at 280.

On August 15, 2016, Castilleja appealed his termination. The same day, the Union sent the Bexar County Judges a letter raising issues related to the substance abuse facilities. Anderson publicly responded to the Union's letter on September 1, 2016. Docket no. 78-3 at 27-32. Castilleja took the same claims to the FBI. Docket no. 78-3 at 34-35. The FBI declined to investigate them, and instead passed the complaint to the Bexar County Sheriff's office, which also declined further action, citing lack of authority over Adult Probation. Docket no.

---

Castilleja's caseload that cause significant concern to the Department for the safety of the community." Docket no. 96-13.

78-3 at 36. Texas Department of Criminal Justice also informed Castilleja that they declined to take any action related to the complaints, noting that Castilleja's "concerns about [the facilitates] ha[d] been addressed." Docket no. 78-3 at 37-39.

On November 9, 2016, the Union sent a letter to Anderson signed by Castilleja and stating that the PAA was seen as a threat to intimidate the Association and its members in order to stop the circulation of the Petition. Docket no. 78-3 at 40; Docket no. 66-3 (Ex. 8). The Second Petition Letter encompassed complaints about low salaries at the department, lack of incentive pay, biases and the lack of merit raises, subjectivity in performance evaluations, lack of a cost of living adjustment, lack of a pay plan increase for substance abuse counselors, changing procedures regarding the correction system software, the disparity between high risk/DWI case officers and non-caseload carrying officers, employee job-related stress, the transferring of cases and defendants lost in transition, unethical conduct at the residential facilities, the lack of due process in grievances and disciplinary matters with no recourse, the one-year probationary period, the lack of respect for retiring officers, Anderson's refusal to meet with the BCPOA, the disconnect between Anderson, the judges, and Department employees, and concludes by stating the signatories have no confidence in Anderson's leadership of the Department. Castilleja also wrote a letter to the presiding criminal judges attaching the petition asking them to evaluate and hold Anderson accountable. Docket no. 78-4 at 14. Anderson and Brady had not seen the Second Petition before it was public on November 9, 2016. Castilleja depo. at 193 ("Q. When was the first time Jarvis Anderson had his eyes on the actual petition document? A. He was served with that on November the 9th or 3rd 2017,

along with the Judges."), *id.* at 194 (agreeing Anderson would not have been aware of the petition contents before November 2019).

After several extension requests by Castilleja's lawyer, Castilleja depo. at 236-37, Anderson heard Castilleja's appeal on November 15, 2016. Castilleja did not dispute that he failed to report violations and follow policy as outlined in the PAA. Tr. at 115. Castilleja admitted that he did not have discretion not to report violations. Tr. at 117. Castilleja ultimately admitted that he should not have been "exercising [his] own judgment on things the courts should decide." When asked if he would follow policy regarding violations in the future and not use his own discretion, Castilleja responded, "I'll try my best." Tr. at 118.

At the hearing, Castilleja called his supervisor Merino to testify. Merino acknowledged that Castilleja was "having difficulties with his case load" and while he did not feel Castilleja was willfully refusing to follow policies, he stated Castilleja "didn't get it" and "was having difficulty." Tr. at 31, 34. As to Castilleja's "old-school" style, he stated that "Sergio is . . . used to doing it that way as opposed to letting the judge make the decision." Tr. at 34. Asked if he agreed with the proposed termination, Merino responded "that's not my say-so." *Id.* Merino never stated at the hearing or to Castilleja personally that he disagreed with the reasons for the proposed termination. Castilleja depo. at 58.

After Castilleja's appeal hearing, in December 2016, Anderson received a quantitative analysis/case audit of Castilleja's Northwest cases and learned of Castilleja's alleged habit of improperly deleting email containing ignition interlock reports. Docket on. 78-5 at 121 (Anderson Decl.); Docket no. 78-4 at 27. Anderson stated these were not the basis of the PAA or his ultimate decision to terminate, but they confirmed that Castilleja's issues were not

17

isolated. *Id.* Anderson informed Castilleja's counsel that a case audit had identified additional information concerning alleged deficient case mismanagement practices by Castilleja. Docket no. 66-2 (Ex. 4); Anderson depo. at 133, 135. Castilleja's counsel wrote back, arguing that the additional allegations needed to be added to the grounds for the PAA to provide Castilleja the opportunity to respond required by Department policies. Docket no. 66-2 (Ex. 5). Anderson declined to amend the PAA to include these allegations. Docket no. 96-7; Docket no. 78-4 at 31; Docket no. 66-2 (Ex. 6). He stated he provided the information as a courtesy and did not change the PAA or add anything to it, the analysis was completed to verify if Castilleja showed a pattern of continuous neglect of case management or whether the identified cases were just isolated incidents, and it confirmed "the gross neglect" that Castilleja had shown in meeting state standards for a certified probation officer, his negligence, his total disregard for the safety of the community, and his blatant refusal to comply with the directives and policies of the Department. *Id.* Anderson stated his final decision was based on the original identified cases and Castilleja's inability to comply with policies and directives. *Id.*

On January 3, 2017, Anderson issued his final decision and terminated Castilleja's employment. He wrote, "I find you have violated our policies and procedures as cited in your proposed adverse action. Your inability to report violations to the Courts in a timely manner and your disregard for proper procedures and compliance with standards set for all probation officers, you are released from administrative leave and terminated from employment effective today, January 3, 2017." Docket no. 78-4 at 30.

Following his termination, Castilleja continued serving as the Union's President until his resignation on August 15, 2017. Plaintiffs filed this lawsuit on December 7, 2017.

18

Defendants moved to dismiss most of Castilleja's claims and all the Union's claims. Docket no. 8. After Plaintiffs conceded some claims and the Court ruled on the motion to dismiss (*see* docket no. 29), four claims remained and Plaintiffs were given leave to replead a fifth witness coercion claim. Defendants now move to dismiss all remaining claims. Plaintiffs cross-move for partial summary judgment on certain issues.

## II. Analysis

### A. The Union's Equal Protection Claim

Plaintiff Union alleges a class-of-one equal protection claim based on alleged unfavorable disparate treatment compared to other union associations such as the Texas Probation Association ("TPA") and the Combined Law Enforcement Association of Texas ("CLEAT"). This claim is brought against Anderson in his official capacity for injunctive relief under *Ex Parte Young*. Defendants move for summary judgment on this claim, asserting it is not cognizable in the context of public employment, and, even if it were, the Union has failed to show it is similarly situated to the TPA and CLEAT. Plaintiffs also move for summary judgment on this claim.

Plaintiffs complain that employees who are members of TPA are permitted to use department email to announce events and to use department vehicles to attend meetings, and that they are provided paid time to attend TPA events, while such treatment is not afforded to BCPOA. Plaintiffs further complain that management officials openly solicited employees during work time and in the workplace to attend a meeting to discuss affiliating with CLEAT, a rival labor organization, while Castilleja's PAA cited his making references to the no-confidence petition to other employees at work . The Union complains that it receives unequal

19

treatment despite the fact that the Department's policies require all employee organizations to be treated the same.

A plaintiff may establish an Equal Protection Clause violation by alleging different treatment from others similarly situated and that no rational basis existed for such treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This is sometimes referred to as a "class of one" claim. *Id.*; *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004). When a plaintiff alleges that a government actor has treated him differently than others similarly situated, "[w]e review such claims under a two-prong test: the plaintiff must show that (1) he or she was intentionally treated differently from others similarly situated and (2) there was no rational basis for the difference in treatment. *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 233 (5th Cir. 2012).

Defendants contend that binding Supreme Court and Fifth Circuit precedents prohibit equal protection class-of-one claims in the context of public employment. In *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), the Supreme Court considered a class-of-one equal protection claim by a former state employee who had been laid off and claimed she was fired for arbitrary, vindictive, and malicious reasons. The Court held that such "a 'class-of-one' theory of equal protection has no place in the public employment context." *Id.* at 594. The class-of-one equal protection claim is well established for challenges to state legislative and regulatory action, but courts have routinely afforded government greater leeway when it acts as employer rather than regulator. *See id.* at 596. "[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to

manage [its] internal operation.'" *Id.* at 598 (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961)). Further, when the state is exercising regulatory authority, there is a clear standard against which departures may be readily assessed, as opposed to subjective, individualized determinations. *Engquist*, 553 U.S. at 602.

The Court further noted, "There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. Thus, class-of-one claims are a poor fit for employee claims that they have been treated differently. *Id.* at 606. "[R]ecognition of a class-of-one theory of equal protection in the public employment context—that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all—is simply contrary to the concept of at-will employment." *Id.*

In *Integrity Collision Center v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016), the Fifth Circuit held that the conclusion and reasoning in *Engquist* "logically applies as well to a local government's discretionary decision to include or not include a [towing] company on a non-consent tow list, where 'allowing equal protection claims on such grounds "would be incompatible with the discretion inherent in the challenged action."'" The Fifth Circuit limited class-of-one claims to contexts in which there is a clear standard against which departures could be readily assessed, and held that "[d]iscretionary decisions about whom to hire as an employee or service provider do not yield the same 'clear standard' by which an equal-

protection claim can be evaluated." *Id.* at 587; *see also Rountree v. Dyson*, 892 F.3d 681, 684-85 (5th Cir. 2018) (extending *Integrity Collision* to city's discretionary decision to remove towing company from non-consent tow list).

The Court agrees that the Fifth Circuit would find the class-of-one claim to be inapplicable in this context. Although this is not an employment decision, it is like the decision in *Integrity* insofar as an employer often makes discretionary decisions about what activity will be allowed as employee training and development and permitted during work hours or even reimbursed. These are not the types of discretionary decisions suited for court evaluation.

Further, the Court agrees that the Union and TPA are not similarly situated simply because they are both associations joined by employees. The TPA is a professional organization for individuals employed with Juvenile and Adult Probation offices in the State of Texas or for those who otherwise work in collaboration with probation through services provided. Docket no. 78-5 at 128-29 (Guzman Decl.). TPA provides a journal and bi-annual training conferences covering topics relevant to probation in Texas and national trending topics in corrections. *Id.* CSCD Policy 4.1 encourages CSCD staff to take advantage of professional memberships that will enhance the performance of their work and professional development within the department, to benefit staff and the department. *Id.* Attending events allows employees to meet state-mandated continuing education requirements. *Id.* TPA does not represent members concerning employee grievances, labor disputes, wages, hours, or working conditions. *Id.* Brady testified that TPA has meaningful conferences and training sessions. Brady depo. at 130. Attendance at TPA conferences is available to all employees. *Id.* Defendants correctly contend that the Union, a labor organization that exists to promote

favorable working conditions and assist its members in bringing employment-related grievances against the Department, is not similarly situated to the TPA, a professional organization that exists to further professional development and provide networking and educational opportunities for probation officers throughout the state. To the extent the Department also allows use of email to promote TPA social events such as golf tournaments, that again falls within the Department's discretion to determine which activities further networking as part of professional development.

With respect to the Union's allegations that it was treated differently than CLEAT because the supervisor of security and a management official solicited membership at work while Castilleja had been admonished for doing Union work on the clock and for soliciting signatures at work, there is no admissible evidence that Anderson or Brady sanctioned or even knew about such preferential treatment with regard to allowing membership solicitation during work hours, if any occurred. Nor is there evidence that any Department official authorized CLEAT members to violate department policy while disallowing BCPOA members.

For these reasons, summary judgment is granted in favor of Defendant on this claim and Plaintiffs' motion is denied.

**B. Plaintiffs' § 1985(2) conspiracy for witness coercion claim**

In Paragraph 174 of the Complaint, Plaintiffs allege, "In attempting to coerce a material witness from testifying on behalf of the Plaintiffs in this action as described in paragraphs 122 and 123 .A. through F. of this Complaint, Defendants Anderson and Brady have infringed and are infringing upon the Plaintiffs' rights of access to the Court in violation of Due Process of Law in violation of the Fourteenth Amendment to the United States

Constitution, for which all Plaintiffs seek relief under 42 U.S.C. §1983 in the form of appropriate restraint and injunction; and have violated and are violating 42 USC §1985(2), for which Plaintiffs seek appropriate restraint and injunction."

Paragraphs 122 and 123 allege that Merino refused to help Escalante and Brady find reasons to discipline Castilleja and later (in October 2017) was transferred to a much less convenient office and was given an unwarranted verbal reprimand ordered by Brady. It also alleges that Merino's wife was threatened with a notice of adverse action by Anderson based on false allegations. Plaintiff alleges that the actions were undertaken by agreement between Anderson and Brady to deter and coerce Merino from testifying on behalf of Plaintiffs in this action and to interfere with Plaintiffs' access to this Court. Am. Compl. Para. 123.F.

Title 28 U.S.C. § 1985(2) makes actionable a conspiracy to obstruct justice by conspiring to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully. To succeed on their witness intimidation claim under Section 1985(2) Plaintiffs must prove that (1) a conspiracy existed, (2) to deter a witness by force, intimidation, or threat from attending federal court or testifying freely in a matter there pending, which (3) caused injury to person or property. *Mitchell v. Johnson*, No. 07-40996, 2008 WL 3244283, at *2 (5th Cir. Aug. 8, 2008) (citing *Rutledge v. Ariz. Bd. of Regents*, 859 F.2d 732, 735 (9th Cir. 1988)). The statute "seeks to ensure the fair adjudication of cases in federal court and provides a civil remedy where individuals conspire to exert untoward external pressure on parties or witnesses because of their participation in judicial proceedings." *Mitchell*, 2008 WL 3244283, at *4. Section 1985(2) requires a "nexus between

24

the alleged conspiracy and a proceeding in federal court -- the conspiracy must seek to deprive the plaintiff of his right in court by physical or economic means. *Mitchell*, 2008 WL 3244283, at *4. In other words, "the conspirator must injure the party or witness in order to deter him from attending or testifying in federal court." *Montoya v. FedEx Ground Pakcage Sys.*, 614 F.3d 145, 149 (5th Cir. 2010)

To state a § 1983 conspiracy claim, a plaintiff must allege facts to support (1) the existence of a conspiracy involving state action, and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. The plaintiff must show that the defendants agreed to commit actions that violated the plaintiff's constitutional rights.

Defendants move for summary judgment on the bases that (1) there is no evidence of a conspiracy, let alone a conspiracy to tamper with a witness, (2) the intra-corporate conspiracy doctrine applies, and (3) there is no evidence of a cognizable injury to a person or property.

Defendants contend that Anderson and Brady could not conspire because "a conspiracy requires the involvement of two or more persons, but the employees of an entity are not considered to be 'persons' separate from such entity for conspiracy purposes." *See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994). The Fifth Circuit has applied the doctrine in § 1985(3) cases and many courts have applied it in § 1985(2) cases. *Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977); *McCracken v. Hardberger*, No. SA-06-CV-988-XR, 2008 WL 219576, at *4 (W.D. Tex. Jan. 25, 2008) (citing *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492 (7th Cir. 1994)(citing numerous cases that hold the employees and agents of a governmental agency are members of the "same collective entity" and therefore are not

separate "persons" who may form a conspiracy within the meaning of § 1985). The Court finds that it applies here.

*Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998) recognized a possible exception to the intra-corporate conspiracy doctrine where "corporate employees act for their own personal purposes," and Plaintiffs invoke this exception. S*ee also Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981) ("[C]ourts have fashioned an exception to the rule that a corporation cannot conspire with its employees: when the officers of a corporation act for their own personal purposes, they become independent actors, who can conspire with the corporation."). Plaintiffs argue that Defendants' respective animosity towards Plaintiffs as reflected by Anderson's February and March 2016 statements to Simonelli and Brady's statements to Merino that Castilleja would be fired over his Union activity, establish that Defendants were acting for their own respective purposes and conspired with one another to keep Merino from testifying in this case through the pattern of harassment.

The Court does not find that the exception applies here. There is no evidence that Brady or Anderson were acting for any personal purpose or outside the scope of employment with regard to any actions taken as to Merino. Plaintiffs' evidence (much of which is hearsay) relates only to alleged personal motives in terminating Castilleja at an earlier point in time.

Even if not barred by the intracorporate conspiracy doctrine, Defendants also correctly contend there is no evidence of a conspiracy to deter Merino from testifying in federal court. According to Defendants, there is no connection between Merino's potential testimony in this case and Merino's transfer to be the manager at a new satellite location and the Department's investigating and proposing—but not ultimately taking—disciplinary action against Merino's

wife (another CSO) in response to a probationer's credible accusation that she had violated Department policy. Merino was transferred in 2017, before this lawsuit was filed, and the evidence indicates that he was transferred to the new satellite office because he had experience opening satellites previously. The evidence also indicates that Ms. Merino was investigated because the Department received a credible complaint that she violated policy. No evidence disputes that the Department, in fact, received such a complaint and that, if verified, such actions by Ms. Merino would constitute a serious policy violation. There is no evidence showing Anderson had any role besides deciding not to terminate or otherwise discipline Ms. Merino based on the incident. Docket no. 78-5 at 122 (Anderson Decl.).

Defendants themselves subpoenaed Merino's deposition testimony in this case. Merino testified that nobody tried to stop him from testifying in this action. Merino depo. at 69 (agreeing no one stopped him from testifying in this lawsuit and stating he was not aware of a conspiracy to prevent him from testifying). When Castilleja was asked what evidence he had that Brady and Anderson conspired to prevent Merino from testifying, Castilleja responded, "I don't have anything," "I don't know what conspiracy you're talking about," and "I couldn't prove conspiracy on that." Castilleja depo. at 254-56. When asked if Merino had been prevented in any way, shape, or form from testifying in the case, he responded, "Not that I know of." *Id.* at 259. The Union's representatives further disclaimed any knowledge of a conspiracy.  Vaughn depo. at 119-20; Velez depo. at 158.

The intra-corporate conspiracy doctrine bars Plaintiffs' conspiracy claims. Further, there is no evidence of any conspiracy to prevent Merino from testifying in a federal court proceeding. Summary judgment is granted in favor of Defendants on this claim.

**C. Castilleja's First Amendment Retaliation Claim**

In Paragraphs 157 to 160, Plaintiffs assert a claim that Castilleja's discharge was unconstitutional retaliation for "his protected exercises of freedom of speech and freedom of association" in violation of the First and Fourteenth Amendments.  This claim is now asserted against Anderson and Brady in their individual capacities for compensatory damages. Specifically, Plaintiffs allege that Anderson, assisted by Brady, retaliated against Castilleja because Castilleja refused to use his position as the new Union president to stop the Union no-confidence petition such that "Castilleja suffered adverse action as a result of his Union associational activity."

1. Brady is entitled to qualified immunity

Brady asserts that he has qualified immunity because he was not the person who decided to terminate Castilleja, and it was not clearly established that an individual who was not the final decisionmaker could be liable. Castilleja contends that the law was clearly established by *Jett v. Dallas Independent School District*, 798 F.2d 748 (5th Cir. 1986).

The Court agrees that Brady is entitled to qualified immunity. In *Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018), the Fifth Circuit reviewed a district court's grant of summary judgment on the basis of qualified immunity for a non-decisionmaker in a § 1983 retaliation case. It recounted that the decision in *Jett v. Dallas Independent School District*, 798 F.2d 748 (5th Cir. 1986), required only that a plaintiff show an affirmative causal link between the individual's conduct and the decisionmaker's decision. It did not matter that the

individual defendant had no authority to make the actual decision. "If an individual defendant's animus against a coworker's exercise of First Amendment rights is a link in the causal chain that leads to a plaintiff's firing, the individual may be liable even if she is not the final decisionmaker." *Sims*, 894 F.3d at 639.

However, later cases had introduced uncertainty into the area by confusing the cat's paw analysis applicable to Title VII cases with individual employee liability under § 1983. In fact, *Johnson v. Louisiana*, 396 F.3d 826, 831 (5th Cir. 2004), had unequivocally held that "only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983" and *Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015) declared the law "unsettled" and afforded a non-decisionmaker qualified immunity in 2015. In 2018, *Sims* clarified that *Jett* is controlling precedent, meaning the law would no longer be "unsettled" in this area. *Sims*, 894 F.3d at 641. However, because the law was unsettled in 2012 when Sims was terminated, the retaliation claim was foreclosed on qualified immunity grounds. The Court therefore affirmed the grant of summary judgment based on qualified immunity.

*Sims* is controlling here as well. The law was still "unsettled" in August 2016 and January 2017 when the actions in this suit took place. Accordingly, Brady, who was not a final decisionmaker, is entitled to qualified immunity. The fact that *Sims* re-affirmed that *Jett* was correct does not help Plaintiffs, just as it did not help Sims.

### 2. Anderson is entitled to summary judgment on his *Mt. Healthy* defense

Defendants contend that Plaintiff's claim fails on the merits because the evidence overwhelmingly establishes that Anderson would have fired Castilleja for his egregious case

management, regardless of his protected activity. Plaintiff contends that he has raised sufficient evidence of pretext to survive summary judgment.

All parties agree that to establish a free speech retaliation claim, a public employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on matters of public concern; (3) his interest in commenting on matters of public concern outweighed the defendant's interest in promoting workplace efficiency; and (4) his speech was a substantial or motivating factor in the defendant's adverse employment action. *See Lane v. Franks*, 134 S. Ct. 2369 (2014). All parties also agree that a First Amendment association retaliation claim requires a plaintiff to show: (1) that he suffered an adverse employment action; (2) that his interest in associating outweighed Defendants' interest in efficiency; and (3) that his association with the union was a substantial or motivating factor in the adverse employment action. *Lawson v.  City of Monroe*, 579 F. App'x 305, 310 (5th Cir. 2014) (citing *Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002)).

In addressing Defendants' motion to dismiss on the basis that Castilleja's speech did not involve a matter of public concern, the Court noted that this case is a mixed association and speech case, and that the standard to be applied to cases involving mixed speech and association outside the context of political patronage and political speech/activity cases is unclear. The Court  concluded that it should apply the balancing test set forth in *McBee v. Jim Hogg County*, 730 F.2d 1009 (5th Cir. 1984), and that Castilleja did not need to satisfy the public concern requirement for his mixed association and speech retaliation claim.

Once a plaintiff has met his burden of showing that his protected speech or association was a substantial or motivating factor in the defendant's adverse employment decision, a

defendant may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech. *Haverda v. Hays Cty.*, 723 F.3d 586, 591-92 (5th Cir. 2013) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 453 (5th Cir. 2013) ("The Fifth Circuit has made clear that, if the *prima facie* elements of a First Amendment retaliation claim are met, the claim is then evaluated under the 'mixed-motive' framework—not the *McDonnell Douglas* pretext analysis."). An employee can, however, refute that showing by presenting evidence that "his employer's ostensible explanation for the discharge is merely pretextual." *Haverda*, 723 F.3d at 592 (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)).

Defendant has satisfied its burden of showing that it would have taken the same adverse action even in the absence of any protected activity. It is undisputed that Castilleja was on "zero tolerance," which expressly included any future case management deficiencies as a basis for immediate termination. It is also undisputed that case management deficiencies were discovered in February 2016 and through investigation continuing through July 2016. These deficiencies were the asserted reason for Brady's recommendation to terminate Castilleja and Anderson's decision to terminate. Anderson testified that he made the decision to terminate based only the case management deficiencies, and in no way on Castilleja's union associational activity or speech.

Plaintiffs contend that they have sufficient evidence of pretext to survive summary judgment and assert, inaccurately, that causation is a fact issue that cannot be resolved at summary judgment. Although summary judgment "should be used most sparingly" in First

Amendment cases and is "generally inappropriate," courts may grant summary judgment when the employer's reasons have not been controverted. *Haverda*, 723 F.3d at 596.

Plaintiffs contend that they have demonstrated improper motive and pretext, allowing them to present their claim to the jury. Plaintiffs contend that they have direct evidence of retaliatory motive, consisting of (1) Escalante's statements to Merino that he was being forced "by administration" to write up Castilleja and did not want to and said or alluded that it had something to do with the union, (2) Brady's statement to Merino that Anderson wanted Castilleja gone because of "union stuff," and (3) Anderson's statements to Simonelli that he would take action against Castilleja because of the no-confidence petition.

Merino testified that Escalante called him and told him "that administration were forcing him to write up Sergio" and that "he didn't want to" and "[t]here was no basis." Merino depo. at 18-19, 27. He also testified that Escalante said "that they wanted him to call me [Merino] to get me involved." *Id.* at 27. Merino testified that Escalante "said that this has to do with the union." *Id.* at 29. Merino testified, "He had told me that because there was no basis for that and . . . he was told to get me involved and he wanted my endorsement because he wanted to come over to the northwest at that time and to write up Sergio, and I said I'm not going to be a part of that. And he said I think this has to do with union." *Id.* at 29. Merino could not remember Escalante's exact words, later equivocating and saying that Escalante merely alluded that this had to do with the union. *Id.* at 29-30. Escalante never said who in the administration was ordering him to write up Castilleja. *Id.* at 31. Defendants correctly assert that Escalante's alleged statements, testified to by Merino, are hearsay. Escalante denied making any of those statements. Thus, this is not competent evidence.

Merino testified that Brady called him "in and asked [him] to find something in Sergio's caseload" about a week before Castilleja was walked out (in August 2016). Merino depo. at 37, 71. Merino testified, "He was – he had asked me about Sergio's stuff, about doing stuff on and off the clock with the union, and I told him that I had told him what he instructed me to do is if you're going to do stuff on the – about the union on the – do it off the clock." *Id.* at 72-73. Merino told Brady he "relayed the message" and thought he told him "I don't know when he's doing union stuff and when he's doing regular work." *Id.* at 73.

Merino further testified that Brady asked about Castilleja's work and Merino told him he was having a little bit of difficulties with the DWI cases but he was working with him. *Id.* Merino testified that Brady then "wanted me to go through his – he had asked me to go through his caseload to find some stuff to see if there was any deficiencies." *Id.* Merino states he asked Brady why he wanted him to go through Castilleja's caseload and Brady "told me that Jarvis wanted him gone because of the union stuff." *Id.* at 74-75. Brady did not explain what he meant by "union stuff." *Id.* at 75. Merino told Brady he wanted no part of it "because there's no validation to it." *Id.*at 76-77. Merino equivocated on what "union stuff" meant, admitting it could be based on legitimate issues such as doing union work on the clock. Moreover, Brady's statement that Anderson wanted Castilleja gone because of the union stuff, testified to by Merino, is hearsay and is not competent evidence.

Simonelli's testimony is also problematic insofar as Plaintiffs rely most heavily on the email she sent to herself in September 2016 recounting the February and March 2016 conversations, which is hearsay, rather than on any deposition testimony. In her deposition, Simonelli testified mostly about what her email said, and offered little independent testimony

of her recollection of the conversations. Although Plaintiffs contend that the email demonstrates that Anderson threatened to come down on Castilleja because of his pursuit of the no-confidence petition and union/employee complaints, it is not so clear. The email can be read to simply support a finding that Anderson personally disliked Castilleja, but does not ever state that Anderson directly threatened to come down hard on Castilleja because he was the Union President or because he was proceeding with the no-confidence petition. Nevertheless, because Simonelli could presumably testify about her recollection of the phone calls at trial, the Court will presume that Plaintiffs have provided some evidence to satisfy the *prima facie* burden of showing that Anderson acted at least in part with an improper retaliatory motive. Plaintiffs therefore satisfy the first part of the test requiring they show that retaliatory motive was a substantial or motivating factor. But Plaintiffs must still show that Castilleja would not have been fired but for the improper motive.

As noted, Defendants satisfy their burden under *Mt. Healthy* to show that Anderson would have terminated Castilleja for the case management deficiencies regardless of his Union activity or speech. Castilleja has admitted most of the policy violations and case management issues identified in the PAA, but contends that they did not warrant termination. He stated he was "aware that I was not perfect" and made mistakes, but denied he did "all the ten cases from" Escalante, stating they were complicated. Castilleja depo. at 220. He agreed that some of the allegations in the PAA did occur and, if true, some of the case management issues in the PAA would be public safety issues and would violate court orders. *Id.* at 216-18, 230. Castilleja agreed that it is a public safety issue not to report drinking by a probationer with three prior DWI's for three months (and that probationer then ended up with a fourth DWI).

Castilleja depo. 221, 225. He denied that he committed infractions, but said, "What I did was something different through my training and as discretion" and "I chose another route." *Id.* at 220. He stated he disagreed with department policies and he "had a different style." Castilleja depo. at 61-62. He stated that his style was different from Anderson's and agreed that "Anderson did not view [his] style as being very good." *Id.* at 64. Castilleja's counsel also admitted that Castilleja had acknowledged deficiencies at the appeal hearing. Tr. 124-25.

Barrera-Fermin, a disinterested party, stated there were "serious case management issues requiring immediate correspondence to the court." Fermin Decl. Brady testified he was "appalled" and he had not seen similar case management decisions to that degree by another CSO, especially a veteran. Brady depo. at 138-39. Escalante called them "the most egregious case management deficiencies he had ever seen." Escalante depo. at 68. Vaughn agreed that a person who leaves a probationer unsupervised for the whole holiday season ignoring the conditions of probation is not someone she wants working for her because he's a liability to the department and danger to the community. Vaughn depo. at 91-92. Vaughn described the conduct as serious, negligent, and grossly negligent. *Id.* at 73, 88-89, 98. She testified she would not want him reinstated knowing about the case management issues. *Id.* at 101, 147. Merino agreed that the conduct was a "no-no" and CSOs did not have the discretion exercised by Castilleja. Merino depo. at 177. He called it inappropriate, mismanagement, "horrible," and a public safety issue and that he would not want that happening in his unit. Merino depo. at 186, 189, 193-94, 204, 206, 223-24. This is strong evidence that Anderson's asserted reason for firing Castilleja was not pretextual.

35

To try to establish pretext, Plaintiffs point to Simonelli's testimony about Anderson's statements in the February and March 2016 phone calls, the chronology of events leading up to Castilleja's termination (including the nexus between the protected conduct and the issuance of the PAA), alleged disparate treatment between Castilleja and other CSOs who committed similar case management infractions, the failure to issue warnings or PIPs or to take steps to rehabilitate Castilleja despite that being the "normal" practice, and the excessive steps taken to find evidence of misconduct. The Court finds that this evidence fails to raise a fact issue on pretext.

As to the chronology of events, it is undisputed that Lyndsey Barrera-Fermin voluntarily transferred and that Anderson then gave Castilleja the transfer to Northwest that he had been wanting. Anderson waived the traditional audit of 20% of Castilleja's cases, indicating he was not looking for a reason to discipline or terminate Castilleja at that time, despite the fact that Plaintiffs allege that he already knew Castilleja planned to move forward with the no-confidence petition at that time. It was only after Stahl made him aware of the case management issues discovered by Barrera-Fermin that he then directed an audit of 100 cases. Further, that audit did not form the basis of Anderson's decision to terminate. Rather, Brady conducted an independent review based on information brought to him by Escalante and Martin, and he independently decided that his review of the Central cases was sufficient to recommend termination. The fact that he then also looked into Castilleja's Northwest cases is reasonable to determine whether such deficiencies existed there that needed attention and remedying, not evidence of excessive investigation. Anderson denies directing Brady's

investigation and there is no evidence that he did so. Brady then provided the case information and termination recommendation (with Anderson's approval) to Lewis.

Although Plaintiffs attempt to establish pretext by showing disparate treatment, they have not shown that a similarly situated CSO was treated more favorably. Simonelli submitted a declaration that these were common mistakes and provided example audits to compare. The Court agrees with Defendants that Plaintiffs have not shown that Anderson ever even knew of or had the opportunity to consider and take disciplinary action based on the alleged case management issues identified in audits reviewed by lower level managers such as Simonelli. Nor do we know what, if any discipline, was provided based on the deficiencies. Moreover, Castilleja's deficiencies were not revealed by an audit, but by Barrera-Fermin, who initially identified them as serious concerns, and then by Escalante and Brady. Brady recommended termination based on his own review, not the audit. Managers testified that the infractions identified in the PAA (not an audit) were extremely serious such that they would justify termination, especially for someone with the level of experience that Castilleja had. Moreover, there is no indication that any other alleged comparator was similarly situated in terms of disciplinary history, infractions, or that they admitted serious infractions but stated that they had their own style in defense of their actions.

As to alleged comparator CSO Rodriguez, Brady testified that the degree of negligence of Rodriguez's case discrepancies "pales to the negligence involved with Officer Castilleja" and there was a significant difference between Rodriguez as only a CSO-1 while Castilleja was a CSO-4. Brady depo. at 137-38. He testified there should be a higher skill level for a CSO-4. *Id.* at 138. He described the difference as "a CSO-1 who's obviously not getting basic

tenets of case management as opposed to a veteran who is intentionally ignoring basic tenets of case management." He testified he was not aware of any other CSOs who have made similar case management decisions. *Id.* at 139.

Plaintiffs further contend that the fact that Castilleja had a good performance evaluation, had never been warned about his deficiencies, and was not given a chance at rehabilitation, as was the normal practice, are evidence of pretext. But Escalante's performance review was middle of the road at best, and Escalante testified he would not have given a "meets standards" rating or made the positive comments had he known about the later-discovered case management deficiencies. Although he was aware of some issues, he was not aware of the full extent of problems, thus he could not have previously counseled or trained Castilleja any more than he did.

Although Merino felt that a CSO should be given an opportunity to rehabilitate or get training and testified that would be typical instead of termination, he did not say that would always be the case for serious infractions or if an employee was on zero tolerance, or that all other managers felt the same way. Nor did Merino ever actually say that he felt that Castilleja should not have been terminated for the infractions in the PAA. At his deposition, Merino stated, "I knew he was having difficulties, but nothing worth writing him up" and he told Brady, "You can go through anybody's caseload and find deficiencies." Merino depo. at 77. However, he had not seen the PAA and was unaware of what specific issues Castilleja was fired for. *Id*.

Moreover, whether individual managers such as Simonelli, Moreno, or Vaughn felt that typically counseling and rehabilitation was appropriate for CSOs does not mean that the

lack of counseling and rehabilitation here was pretext. As noted, Castilleja was on zero tolerance for further case management issues, his violations were more serious than that of other CSOs, and he admitted that he was violating policies but justified his actions as using his own discretion, which he admitted he lacked, and only said he would "try" to do better in the future. The Court finds that Plaintiffs have not introduced sufficient evidence of pretext to survive summary judgment.

**D. The Union's First Amendment intimidation claim**

The Union alleges that Defendants fired Castilleja, the Union president, with the intent to make an example of him, stop the Union's no-confidence petition, and deter and coerce employees from supporting the petition and the Union. The Union alleges that the chilling effect created by Anderson's discharge of Castilleja made Union members uneasy about asking other employees to join the Union and made members uncomfortable about signing the petition or soliciting further signatures on the petition, and that Union membership declined by approximately 30% or more, resulting in loss of dues. Complaint ¶ 121.  Although it sought Castilleja's reinstatement as a remedy, such relief is no longer possible. The Union contends that injunctive relief in the form of an injunction against Defendants taking adverse employment actions against Union members because of their association with and speech on behalf of the Union would now be appropriate relief.[5]

The First Amendment protects a public employee's right to associate with a union. This right encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government on their behalf. These rights flow to unions as well as to their members and organizers. *PACE v. El Paso Comm. College Dist.*, 730

---

[5] This Court previously held that the Union had organizational standing and representational standing.

F.3d 258, 262 (5th Cir. 1984) (quoting *Allee v. Medrano*, 416 U.S. 802, 8199 n.13 (1974)). Similarly, the First Amendment protects the right of associations to engage in advocacy on behalf of their members, and the government is prohibited from infringing upon these rights either by a general prohibition against certain forms of advocacy or by imposing sanctions for the expression of particular views it opposes. *Smith v. Arkansas State Hwy. Employees, Local 1315*, 441 U.S. 463, 464 (1979). The Supreme Court recognized in *Smith* that taking steps to discourage union membership or association is an impairment that the Constitution prohibits. *Id*. at 466. Thus, the actions of a public employer "whose purpose is either to intimidate public employees from joining a union . . . or to retaliate against those who do" violates the First Amendment. *Hitt v. Connell*, 301 F.3d 240, 245 (5th Cir. 2002) (citing *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993)); *Mote v. Walthall*, No. 4:16-CV-00203, 2017 WL 2651705, at *5 (E.D. Tex. June 20, 2017).

Defendants contend that this claim fails due to a lack of evidence that the true purpose of firing Castilleja was to intimidate, chill, or destroy the Union on account of protected activity, and due to a lack of evidence that the Union suffered any membership loss due to the termination. Defendants assert that Anderson's decision to terminate Castilleja was based solely on egregious case management issues, and there is no evidence of a purpose to intimidate Union members. Anderson has denied authorizing the PAA and ultimate termination because of Castilleja's role with the Union or any speech, to injure the Union, or to intimidate or scare its members. Docket no. 78-5 at 121 (Anderson Decl.). He states he has terminated both Union and non-Union employees, and promoted and given raises to both, including prominent Union members such as Sheri Simonelli, Jennifer Vaughn, and Larry

Rodriguez. *Id.* The Court agrees with Defendants for these reasons and for the reasons discussed above, and grants summary judgment for Defendants on this claim.

### E. Castilleja's claims under Texas Labor Code § 101.301

Castilleja alleges he was terminated in violation of Texas Labor Code § 101.301. Defendants contend that § 101.301 does not cover public sector unions and, even if it did, Anderson and Brady have official immunity to such a claim. Plaintiffs contend that Chapter 101 applies to public employees and that Defendants are not entitled to official immunity because they were not acting in good faith and within the scope of their duties.

Section 101.301 provides, "The right of a person to work may not be denied or abridged because of membership or nonmembership in a labor union or other labor organization." TEX. LAB. CODE § 101.301(a). Section 101.301(c) creates a private right of action: "A person who violates this subchapter is liable to a person who suffers from that violation for all resulting damages." Defendants assert that Chapter 101 does not apply to public sector employees because of a conflict with a similar provision in Chapter 617 of the Government Code applicable to public sector employees, which does not create a private right of action for public sector employees.

The Court need not decide whether § 101.301 affords Castilleja a private right of action because it finds, for the reasons described above, that Anderson and Brady acted reasonably in their dealings with Castilleja and thus they are entitled to official immunity. Summary judgment is granted on this claim.

**Conclusion**

Plaintiffs' Motion for Partial Summary Judgment (docket no. 66) is DENIED IN PART and DISMISSED AS MOOT IN PART. Defendants' Motion for Summary Judgment (docket no. 78) is GRANTED.

Plaintiffs shall take nothing by their claims and their claims are DISMISSED WITH PREJUDICE.

The Clerk shall enter a Final Judgment pursuant to Rule 58 and shall CLOSE this case.

It is so ORDERED.

SIGNED this 21st day of May, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE